**J.A. MOORE CONSTRUCTION CO., a Delaware corporation, Plaintiff,**

v.

**SUSSEX ASSOCIATES LIMITED PARTNERSHIP, a Maryland Limited Partnership, et al., Defendants.**

**J.A. MOORE CONSTRUCTION CO., a Delaware corporation, Plaintiff,**

v.

**REHOBOTH MALL LIMITED PARTNERSHIP, a Maryland Limited Partnership, et al., Defendants.**

**J.A. MOORE CONSTRUCTION CO., a Delaware corporation, Plaintiff,**

v.

**Richard M. SINGER, et al., Defendants.**

Civ. A. Nos. 86–498–JRR, 86–499–JRR and 87–82–JRR.

United States District Court, D. Delaware.

June 21, 1988.

Dennis L. Schrader of Wilson, Halbrook & Bayard, Rehoboth, Del. (Douglas G. Worrall, of Smith, Somerville & Case, Baltimore, Md., of counsel), for plaintiff.

Daniel F. Wolcott, Jr., Gregory A. Inskip, and Michael B. Tumas of Potter, Anderson & Corroon, Wilmington, Del. (James L. Shea, and Gary M. Hnath, of Venable, Baetjer & Howard, Baltimore, Md., of counsel), for defendants.

## OPINION

ROTH, District Judge.

Before the Court are motions by defendants in three cases which involve disputes arising from the construction of the Rehoboth Mall in Sussex County, Delaware. Plaintiff in all three cases is J.A. Moore Construction Company ("Moore"), which was general contractor for construction of the Mall. Moore has brought two actions, now consolidated, based on breach of con-

tract, *quantum meruit* and fraud,[1] and one action pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* Defendants in all three actions are Richard M. Singer ("Singer"), the project's promoter; R.M. Singer & Associates, Inc. ("Associates"), the developer; Rehoboth Mall Limited Partnership ("Rehoboth LP"), leaseholder and operator of a major portion of the Mall; Sussex Associates Limited Partnership ("Sussex LP"), leaseholder and operator of that portion of the Mall occupied by the Peebles Department Store; Patrick J. B. Donnelly, John G. Wharton, and Andrew N. Lutyk, limited partners in Rehoboth LP and Sussex LP; Peter Nierenberg, limited partner in Sussex LP; and William R. Russell, general partner of Sussex LP and a limited partner in Sussex LP and Rehoboth LP. Defendant Singer is general partner of Rehoboth LP and president of Associates. Defendants have moved for summary judgment on the contract, *quantum meruit* and fraud claims and for dismissal of the RICO claims. Because matters outside the complaint are considered in the motion to dismiss the RICO claim, we will consider it also to be a motion for summary judgment. For the reasons set forth below, we will grant in part and deny in part defendants' motions with respect to the contract and fraud claims. We will grant defendants' motions on the *quantum meruit* and RICO claims.

## I. FACTS.

### A. *Rehoboth Mall Project.*

Most of the negotiations for the general contract to build Rehoboth Mall took place between Richard Singer and Randy Radish, Assistant Secretary of the J.A. Moore Company. Plaintiff claims that, unknown to Radish, defendants were confronted with

---

1. Plaintiff also asserted a mechanics' lien under Delaware law in each of these actions. Defendants moved for partial summary judgments dismissing the mechanics' lien counts in both suits. These motions were based on language in the contracts which waived the right to file mechanics' liens. The motions were granted by orders entered February 5, 1987, and the mechanics' lien count of each complaint was dismissed.

On July 28, 1987, on defendants' motions, final judgments were entered on the orders, pursuant to Fed.R.Civ.P. 54(b). The Third Circuit Court of Appeals has affirmed the dismissal of the mechanics' liens. *J.A. Moore Construction Co. v. Rehoboth Mall Limited Partnership,* 841 F.2d 1119 (3d Cir.1988).

difficulties in setting up financing for the Mall. Defendants intended to finance the project with Internal Revenue Code § 103(b)(6)(D) industrial development bonds to be issued by Sussex County. Under the Tax Code, in order for the interest from such bonds to be free from federal income tax, capital expenditures on the project financed by the bonds could not exceed $10,-000,000. To meet this limitation, defendants divided the Mall into two projects with two limited partnerships. One partnership, Rehoboth LP, constructed the major part of the Mall and was financed by the industrial development bonds. The second partnership, Sussex LP, backed by conventional financing, constructed the Peebles Department Store, located in the Mall.

To finance the Rehoboth LP portion of the Mall, Sussex County issued a $7,770,-000 Economic Development Revenue Bond on December 28, 1984. The Bank of New York is the only holder of the bond and enjoys certain protections in the event that the bond looses its tax-favored status. Should the $10,000,000 capital expenditure limitation be exceeded and the interest on the bond no longer be excluded from gross income for federal income tax purposes, the interest which Rehoboth LP pays to the Bank of New York would increase as of that time from 75 percent of the Bank of New York's Prime Rate up to the Bank of New York's Prime Rate plus 1 percent, that being the same interest rate which Sussex LP currently pays to the Bank of New York on the money borrowed for the construction of the Peebles Department Store.

Singer asked Radish to sign written contracts and allegedly assured him that the construction contracts were required solely for the purpose of obtaining the bond financing before the end of 1984. On November 26, 1984, both partnerships executed stipulated sum contracts with plaintiff to construct the project.[2] Randy Rad-

ish signed for plaintiff. The contracts were reexecuted in substantially the same form by Ronald Moore, president of the J.A. Moore Company, on April 1, 1985, at the request of his bonding company. Plaintiff claims that defendants knew the contracts provided inadequate compensation. In fact, some of plaintiff's cost estimates exceeded the stipulated sums in the contracts and parts of the project, such as the waste water treatment plant and the entrances from the highway, had not yet been designed. Singer allegedly promised Radish that defendants would pay the difference between the contract stated price for on-site costs, off-site costs and contingencies and the actual trade subcontractors' prices, plus any direct costs for work performed by Moore's own forces. Moreover, contracts contained provisions for Change Orders to cover additional costs. However, any such changes had to be approved in writing by Rehoboth LP or Sussex LP.

During the course of construction, plaintiff obtained interim payments pursuant to the terms and procedures specified in the contracts. Plaintiff claims that in so doing, it was not vouching for the validity of the contracts but rather was merely following Singer's instructions to preserve the appearance for financing purposes that the contracts were being followed. Defendants cultivated such an appearance, contends plaintiff, to insure defendants' tax-favored financing of the Rehoboth LP portion of the Mall.

Following the execution of the contracts, construction of the Mall was held up until May, 1985, due to zoning problems. Some preliminary work, however, was completed by Moore during the interval, including excavation and ground fill. On May 28, 1985, Moore made an application to Rehoboth LP for payment for work performed to that date. Included in the application was Change Order No. 1, adding the amount of

2. The contracts for both partnerships were substantially the same. The contracts were American Institute of Architects (AIA) form agreements as modified by the parties for this particular project. The AIA form, widely used in the construction industry, is a comprehensive contract and in this case contained four sections: (1) the "Standard Form Agreement Between Owner and Contractor"; (2) the general Conditions of the Contract for Construction; (3) Exhibits including Drawings and Specifications; and (4) Supplementary Conditions.

$8,442.00 for removing and replacing unsuitable fill material.

Plaintiff contends that Singer at this point instructed Radish that under no condition was Moore to submit any more Change Orders. Singer purportedly gave this command because he was afraid further Change Orders would push the capital expenditures over the $10,000,000 limit. Plaintiff asserts that its employees were directed by Singer to ignore the contract provisions requiring written approval of any changes. Also, plaintiff claims that it was instructed to bill key tenants of the Mall directly for any additional costs and was promised that the parties would "settle up" any further amounts owing to Moore at the end of the job. Apparently, underestimates, changes in design and completion of additional parts of the overall plan then resulted in plaintiff paying costs beyond the contract figures.

As the project neared completion in the spring of 1986, Moore submitted to the partnerships a large number of requests for payment for changes. On May 9, 1986, defendant Wharton wrote to Ronald Moore, stating that no payment would be made for contract extras unless the written change order procedure had been followed. Because the parties could not agree on what moneys were due to Moore, two suits were filed on September 11, 1986, in the Superior Court of the State of Delaware in and for Sussex County to collect $1,800,650.53, the amount Moore alleges is owing to it for the construction of the Mall. The suits were removed to this Court in October, 1986. The RICO action was then filed on February 24, 1987.

### B. *USF & G Suit.*

Plaintiff's RICO allegations require us to summarize some additional facts. In particular, plaintiff describes a suit filed by defendants Rehoboth LP and Sussex LP in Baltimore, Maryland, against Moore's bonding company, United States Fidelity and Guaranty Co. ("USF & G"). In this suit, Rehoboth LP and Sussex LP alleged that USF & G had exercised bad faith in investigating claims for payment made by Moore and its subcontractors. The two limited partnerships sought to have USF & G discharge liens imposed on the project. Moore argues that the allegations of bad faith against USF & G were made to induce Moore to give up its claims against defendants. Also, under its bonding agreement with USF & G, Moore had to indemnify USF & G for fees and costs incurred in the lawsuit. Moore argues that the bad faith claim against USF & G caused, or threatened to cause, economic injury to Moore, an extortionate act under Maryland law.

### C. *The Ocean Plaza Mall Project.*

In support of its RICO suit, plaintiff also describes an earlier Singer project which allegedly involved a similar scheme to defraud a contractor. Singer and Singer Associates developed the Ocean Plaza Mall in Maryland. The general contractor for the Ocean Plaza project was the Knott Company.

Plaintiff claims that Singer fraudulently induced the principal of the Knott Company, Frank McGuinness, to eliminate certain work from the written contract so that the contract price would remain under a limit which Singer could not exceed in order to close on his financing. After the project commenced, Singer contended that Knott was obligated to perform certain work that Knott had understood to have been eliminated from the contract. Knott performed the work and made claims for "extras". The parties submitted their dispute to arbitration. Knott was awarded full or partial recovery for most of its claims.

## II. ANALYSIS.

### A. *Claims Presented.*

Plaintiff's contract action raises two claims. The first is that the written contracts were signed with the understanding that "stipulated sum" contracts were needed before the end of 1984 for financing but that the parties had an oral understanding that the defendants would pay the difference between (1) the contract stated price for on-site costs, off-site costs and contingencies, and (2) the actual subcontractors'

prices plus any direct costs incurred by plaintiff. The second claim is that the parties had an oral agreement that arose after the execution of the written contracts, according to which the defendants would pay for extra work performed that was not covered in the contracts. Plaintiff alleges it received a promise of payment for extra work even though the contractual procedure for change orders was not to be followed. As an alternative theory for both of these claims, plaintiff contends that it is entitled to recovery in *quantum meruit.* Finally, plaintiff alleges that defendants have committed fraud entitling plaintiff to compensatory and punitive damages. Plaintiff in its third suit raises claims under three subsections of the RICO statute.

### B. *Scope of Review.*

On a motion for summary judgment, the court's task is to determine whether the non-moving party raises any genuine issues of material fact. *J.E. Mamiye & Sons, Inc. v. Fidelity Bank,* 813 F.2d 610 (3d Cir.1987). The standard is akin to the standard for a directed verdict: "Whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party may prevail as a matter of law." *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). The burden is on the moving party to justify summary adjudication. *Pettinaro Construction Company, Inc. v. Delaware Authority for Regional Transit,* 500 F.Supp. 559 (D.Del.1980). All facts must be construed in favor of the non-moving party. *Chirinos de Alvarez v. Creole Petroleum Corp.,* 613 F.2d 1240, 1244 (3d Cir.1980). Where the non-moving party will bear the burden of proof at trial on a dispositive issue, that party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed. 2d 265 (1986) (quoting Fed.R.Civ.P. 56(e)). When factual issues, as supported by affidavits and other evidence, admit only one

conclusion, the court shall not draw an opposite conclusion merely on the basis of unsupported allegations. *Chirinos de Alvarez,* 613 F.2d at 1244.

### C. *Breach of Contract Claims.*
#### (1) The Written Contracts.

■ Plaintiff's first claim, regarding the existence of oral agreements which contradict the later executed written contract, cannot survive summary judgment by virtue of the parole evidence rule. The parole evidence rule bars evidence of prior or contemporaneous agreements or negotiations that contradict the terms of an "integrated," *i.e.,* complete, writing. *Restatement (Second) of Contracts* § 215; *Cunningham v. Esso Standard Oil Company,* 118 A.2d 611 (Del.1956). In this case, both of the contracts which plaintiff executed contain an integration or merger clause which provides:

> The Contract Documents form the entire and integrated agreement between the parties hereto and supersedes all prior negotiations, representations, or agreements, either written or oral. The Contract may be amended or modified only by a Modification as defined in Subparagraph 1.1.1

The existence of such a clause in a formal written contract between sophisticated parties is, in the absence of unconscionable or other extraordinary circumstances, conclusive evidence that the parties intended the written contract to be their complete agreement. *See E. Farnsworth, Contract,* § 7.3 (1982). *See also, Husband (P.J.O.) v. Wife (L.O.),* 418 A.2d 994, 996 (Del.1980) (parole evidence rule excludes evidence of additional terms to integrated written agreement; writing here held not to be complete).

However, even with a completely integrated agreement, parole evidence may be introduced to show fraud, accident or mistake as a ground for recision. *See, Fr. Winkler KG v. Stoller,* 839 F.2d 1002, 1005 (3d Cir.1988); *E. Farnsworth, supra* at 7.4. Invoking the fraud exception, plaintiff argues that parole evidence of the parties' oral agreements should be admitted to show that the written contracts were nulli-

ties. As fully explained in Section D below, we find that plaintiff has not raised any genuine issue of material fact in regard to its fraud claim as it pertains to oral promises made prior to or at the time of the execution of the written contracts. Hence, we will not admit parole evidence under the fraud exception. *Fr. Winkler KG,* 839 F.2d at 1006 (reliance upon a promise not to enforce a note does not constitute fraud so as to permit parole evidence of that promise).

Since plaintiff has entered into a valid and integrated agreement, it may not introduce evidence of a prior oral agreement to contradict the written contracts. After applying the parole evidence rule, we find that no genuine issue of material fact remains with respect to this aspect of the plaintiff's claim and summary judgment as to it will be entered.

(2) Contract Modifications and Extras.

■ Plaintiff's second claim raises the question of whether subsequent to the written agreements the parties entered into oral agreements for "extras" or modifications. The parole evidence rule bars evidence only of negotiations and agreements which precede or are contemporaneous with a written integrated agreement. Subsequent bargains may arise at any time and may be pleaded and proved by the aggrieved party. *Pepsi–Cola Bottling Co. of Asbury Park v. Pepsico,* 297 A.2d 28 (Del. 1972). This rule of law applies notwithstanding any contractual provisions precluding oral modifications to a contract. *Id.* at 33. Such a "no oral modification" clause in a written contract "may be waived or modified in the same way in which any other provision of a written agreement may be waived or modified, including a change in the provisions of the written agreement by the course of conduct of the parties." *Id.* at 33.

In this case, the requirement under both contracts that all change orders be in writing and approved by the partnership was allegedly waived or modified by the parties. Plaintiff claims that it reached a subsequent oral agreement with the partnerships to undertake extra work without following the contracts' change order procedures. The first Radish Affidavit describes the alleged subsequent agreement and supports its existence sufficiently for purposes of withstanding summary judgment. We must await trial to determine whether any such agreement arose, and if so, its terms and their effect on the written contract.

(3) Quantum Meruit.

■ Plaintiff asserts *quantum meruit* as an alternative theory of recovery. *Quantum meruit,* a Latin phrase meaning "as much as he deserves," is a basis for recovery to prevent unjust enrichment. Under this theory, plaintiffs are asking the Court to imply a promise by defendants to pay for plaintiff's extra work. Such an implied promise to pay for work performed gives rise to a quasi-contract upon which plaintiff may recover. *E. Farnsworth supra* at § 2.20. *See also, Womach v. Thomas,* 486 A.2d 15, 18 (Del.Ch.1984). The essential elements of a quasi-contract are a benefit conferred and acceptance by defendant of that benefit under circumstances that would make it inequitable to allow defendant to retain it. *Hershey Foods Corp. v. Ralph Chapek, Inc.,* 828 F.2d 989, 999 (3d Cir.1987); 66 *Am Jur.2d Restitution and Implied Contracts* § 2 (1973). The existence of an express agreement, whether written or oral, precludes the finding of a quasi-contract. *See* 66 *Am Jur.2d* at § 6; *see also, Hershey Foods Corp.,* 828 F.2d at 999; *Van Orman v. American Insurance Co.,* 680 F.2d 301, 312 (3d Cir. 1982) (New Jersey law); *Nepa v. Marta,* 415 A.2d 470, 472 (Del.1980).

Applying these principles to plaintiff's claim, we find that plaintiff may not assert a *quantum meruit* theory as an alternative basis for recovery on the written contracts, either as to work described in the contacts or as to work done in addition to what the contracts called for. Given the existence of the written contracts, plaintiff may not be compensated " 'on the ground of unjust enrichment if he received from the other what it was agreed ... the other should give in return'." *Van Orman, supra* at 312, *quoting Restatement of Restitution* § 107 & Comment 1. Plaintiff

should not expect to be compensated for additional work performed, without prior written approval, when the parties had expressly bargained not to compensate plaintiff for such work unless it had been specifically authorized in writing. With respect to any contract extras or modifications, not covered by the contracts, the executed contracts provide the mechanism by which such work will be authorized and paid for, *i.e.*, the written change order provisions. Absent any subsequent agreement concerning such additional work, therefore, the change order requirements govern the relationship of the parties. A *quantum meruit* action cannot be the basis of a claim for extras or modifications since a procedure for approval of and compensation for this work is provided for in the written contracts.[3]

Plaintiff further alleges that it entered into a subsequent oral contract with defendants according to which plaintiff would be paid for extra and modified work without the necessity of going through the change order requirements of the written contracts. Again, however, a *quantum meruit* action would not lie for a claim for such work because in order to escape the change order provisions of the written contracts, there would have to have been a finding of an oral contract, covering the performance of the work.[4] The existence of such an oral agreement would preclude *quantum meruit*. Under the facts of this case, plaintiff cannot recover for the "change order" work unless the written contracts were complied with or a subsequent oral agreement was entered into. Under either set of facts, the existence of the contractual relationship bars the invocation of *quantum meruit*. For these reasons, defendant's motion for judgment in

their favor on the *quantum meruit* claims will be granted.

### D. *Fraud.*

As a general rule, fraud claims are inappropriate for summary adjudication because such claims raise issues of state of mind. 10A *Wright, Miller, & Kane, Federal Practice and Procedure: Civil 2d* § 2370. In the context of a contract dispute, however, the court remains cognizant that every claim of a broken promise can be converted into an allegation of promissory fraud. While the moving party bears the burden of proving that no material facts are in dispute, the non-moving party who has asserted fraud cannot rest on mere allegations. *See, Wright, Miller & Kane, supra* at § 2730 n. 23 (collecting cases). *See also, Tilden Financial Corp. v. Palo Tire Service, Inc.*, 596 F.2d 604, 607 (3d Cir.1979). Plaintiff must seek to establish, through affidavits or discovery, the existence of genuine issues of fact for trial. *Id.*

In Delaware, the elements of fraud are "false representation of material fact, knowingly made with intent to be believed, to one who, ignorant of its falsity, relies thereon and is thereby deceived." *Harman v. Masoneilan International, Inc.*, 442 A.2d 487, 499 (Del.1982). In addition, reliance upon the false statement must be "justifiable." *Stephenson v. Capano Development, Inc.*, 462 A.2d 1069, 1074 (Del. 1983).

There are two circumstances of fraud alleged in the Consolidated Second Amended Complaint, that described in paragraphs 18–35, which allegedly led to the execution of the construction contracts by plaintiff (hereinafter the "Contract Fraud") and that described in paragraphs 36–43, which alleg-

---

**3.** The issue of whether the "extra work" done by plaintiff was covered by the contracts was also considered in the motions to dismiss the mechanics' liens. Plaintiff at that time argued that the extra work was not within the original contracts or covered by any written supplemental contract or written change order. In plaintiff's view, therefore, the extra work was not subject to the waiver of lien provisions in the contracts. In dismissing the mechanics' liens, we held that

the "extras" were covered by the waiver of liens provisions of the contracts. The Third Circuit Court of Appeals agreed with this conclusion in affirming the dismissal of the mechanics liens. *J.A. Moore Construction Co. v. Rehoboth Mall Limited Partnership*, 841 F.2d 1119 (3d Cir.1988).

**4.** See discussion Section C(2) *supra.*

edly led plaintiff to forego the requirements for written change orders (hereinafter the "Change Order Fraud").

■ Looking first at the Contract Fraud, we have examined the record to determine if plaintiff has supported the necessary elements of fraud. Only the affidavit of Randy Radish, filed by plaintiff, directly supports the Contract Fraud claim. Radish states in his affidavit that he was promised that the written contracts would not control the transaction and that contract extras would be paid for. While this affidavit details the promises made, we are provided no further support that the promises were false when made or that the falsehood was knowing. Plaintiff does cite numerous documents which evidence that certain aspects of the building project were not negotiated or decided upon until well after the contracts were signed. However, the contracts by their own terms contemplated that changes in work and specifications would arise. It does not, therefore, follow that the written contracts were nullities because the project was not completely planned at the time the contracts were signed.

Moreover, even if we assume that false promises were made by defendants with intent to defraud, we must then consider whether, in light of the oral promises, plaintiff's own actions on the record now before the Court preclude a finding of reasonable reliance on these promises. To conclude that reliance was justifiable we would have to disregard a multimillion dollar written construction contract which was negotiated at arms-length and duly executed for plaintiff by Radish and then reexecuted by plaintiff's president, Ronald Moore, four months later. In considering whether plaintiff has shown "justifiable reliance," we agree with the reasoning of *Turner v. Johnson & Johnson*, 809 F.2d 90, 96 (1st Cir.1986), a fraud case in which the court stated that "a contractual provision flatly contradictory to prior oral assurances should cause most people—and particularly knowledgeable business people—to pause." Other than its credulous plea that a construction company, which was negotiating a multimillion dollar contract, had designated an "inexperienced" representative to bargain for it, plaintiff has not pointed out any support in the record to demonstrate that its reliance on defendants' "promises" was reasonable.

Plaintiff attempts to paint the picture that the contracts were form agreements which Radish hastily signed without studying the documents. To this effect, Radish alleges in an affidavit that neither he nor anyone else employed by Moore negotiated or suggested changes or modifications to the contracts, other than Radish's discussions with Singer regarding contract prices. Radish states that he expressed his concern that the prices were below its estimates and that Singer allegedly assured him that these contract prices would not be binding on Moore. Yet this very concern about price, to which plaintiff admits, belies its claim that it hastily signed the contracts without reviewing them or recognizing their import.

Our review of the undisputed record indicates that the contract documents were under consideration by the parties for over two months before they were executed on November 26, 1984. On August 31, 1984, plaintiff received preliminary plans from Singer, along with Singer's representation that a stipulated sum contract, based on the American Institute of Architects (AIA) form, was being prepared. Although Radish felt the plans were incomplete, by the end of September he had, on the basis of the estimates he received on these plans, calculated the expected cost of the project. On October 16, 1984, Donnelly, acting as counsel for Singer, wrote to Radish enclosing "a working draft of the proposed contract for the Rehoboth Mall." Donnelly mentioned that certain amendments might be required by the Bank but that there would not be any provisions that would be impossible for Singer and Radish to live with. Both of these letters evidence the parties' intention that the contract documents would embody in writing the parties' agreement.

Furthermore, the final cotract for the Rehoboth LP, as executed by the parties,

was handmarked "FINAL" on the cover sheets. On both the Rehoboth LP and Sussex LP contracts, each interlined section of the AIA form was initialed by Radish. Each page of both contracts was initialed by Radish and Singer. In addition, several typewritten pages were appended to each contract.

The nature of the contracts and the parties, the amount of money involved, and the formalities that attended the negotiations and execution preclude any genuine issue that plaintiff justifiably relied on defendants' promise that the contracts were not binding. Moreover, even if defendants claimed that the contracts were merely for financing purposes, plaintiff was not justified in signing contracts which provided inadequate consideration. *See, McLean v. Alexander,* 420 F.Supp. 1057, 1086 (D.Del. 1976) ("[P]laintiff has a duty to act with reasonable prudence in his business dealings.") For the above reasons, therefore, we will grant summary judgment to defendants on the Contract Fraud claims.

■ Turning to the Change Order Fraud allegations, we find that, at least as to the Rehoboth LP project, insofar as Singer made oral promises on May 28, 1985, and thereafter that plaintiff would be paid for extra work without the necessity of submitting written change orders, there is a question of material fact as to whether or not these promises were false at the time they were made and were knowingly made by defendant Singer to induce plaintiff to refrain from complying with the change order provisions of the contracts. Defendants had a motive to hold down expenses of the Rehoboth Project in order not to exceed the $10,000,000 construction cost limitation and not to incur higher interest costs. This motive is more compelling in connection with the Change Order Fraud allegations than it was with the Contract Fraud claim because it was the "Change Order" escape hatch of the written contract which was now the threat to the $10,000,000 cost limitation. The Rehoboth LP contract itself did not exceed the cap, and, as we have shown, plaintiff, when it signed the contracts, was not justified in relying on oral

promises of additional payments. However, when plaintiff purportedly agreed to forego the written change order procedures, it was not contemporaneously signing an agreement which expressly precluded unauthorized extras or modifications. In addition, it would appear that in May, 1985 it was more evident that there were design changes and extra costs that were not incorporated in the fixed sum contracts. The threat of exceeding the $10,000,000 was more imminent. Plaintiff has presented this threat as defendants' motive for making false promises of payments for extras without the necessity of change order approval. We find this change in circumstances in effect creates a fact issue on the question of fraud, which did not arise earlier when the written contracts were executed.

Unlike the Contract Fraud claim, we cannot, therefore, decide the question of justifiable reliance on summary judgment because we must consider the factual circumstances surrounding the oral promises made subsequent to the written contract. We harbor some doubt that plaintiff will be able to prove justifiable reliance upon these later promises. Although plaintiff may have a contract claim for the change orders, we question whether plaintiff rightfully relied, for purposes of a fraud claim, on oral assurances that as much as $1.8 million in changes and modifications to the written contracts would be "settled up" at the end of the project. We must nonetheless await trial for determination of this claim.

Although we focus on the Rehoboth LP motive to list costs to $10,000,000 in declining to grant summary judgment on the Change fraud charges, we will also deny summary judgment to Sussex LP, even though it did not face this spending cap. We make this ruling because we cannot now determine that fraudulent promises were not also made by defendants to plaintiff in regard to modifications and extras under the Sussex LP contract.

However, even though we will permit the Changer Order Fraud claims to go to trial, this need not be as to all defendants. We

cannot ascertain at this juncture which defendants were actually involved in the Change Order Fraud claims. We can, however, determine that some defendants were not involved. An examination of paragraphs 17 and 19 of the first affidavit of Randy Radish indicates that statements to plaintiff about change orders and extras were made by Singer and Nierenberg. These two individuals were associated with and may have been acting on behalf of Associates, Rehoboth LP and Sussex LP. The claim against these five defendants will not be dismissed. Concerning defendants Lutyk, Wharton, Donnelly, and Russell, however, plaintiff's attorney has acknowledged that they were not involved in the activities which give rise to the fraud allegations:

> Insofar as their status is concerned, Messrs. Lutyk, Wharton, Donnelly, and Russell are not alleged to have committed racketeering activities as individuals, and it is my assumption no facts will develop in the future which will change that allegation.

July 9, 1987, letter from Douglas G. Worrall, Esquire, to James L. Shea, Esquire. Because plaintiff has conceded that these four defendants were not involved in the alleged fraudulent acts, the fraud counts against them will be dismissed.[5]

### E. *RICO.*

#### (1) The Statutory Requirements.

The plaintiff relies upon three subsections of the RICO Act. The first, 18 U.S.C. § 1962(a) prohibits the investment of proceeds from racketeering activity and provides in relevant part:

> (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

The second subsection raised by plaintiff is 18 U.S.C. § 1962(c) which creates RICO liability for any person employed by or associated with a racketeering enterprise.

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Finally, plaintiffs allege a RICO conspiracy, prohibited by 18 U.S.C. § 1962(d):

> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

To satisfy either subsection (a) or (c) of 18 U.S.C. § 1962, plaintiff must show that: (1) defendants committed at least two predicate acts of racketeering activity, (2) the acts constituted a pattern, (3) the activity was carried on as part of an enterprise, and (4) plaintiff was injured in his business or property by the conduct constituting the violation. With respect to the first RICO element above, the predicate criminal offenses which constitute racketeering activity are set forth in 18 U.S.C. § 1961. Included in the specified offenses are the predicate acts asserted here by plaintiff, federal mail and wire fraud and state law extortion.

#### (2) The Predicate Acts Alleged.

In this action, plaintiff alleges two levels of predicate acts giving rise to a pattern of racketeering activity. On one level, plaintiff has described the involvement of Sing-

---

**5.** Plaintiff claims that these four defendants should be liable as "general" partners in Sussex LP since this limited partnership was not properly created until May 24, 1985. Defendants contend that they are retroactively protected as limited partners. Since the Change Order Fraud charges arise after May 28, 1985, following the perfection of the limited partnership on May 24, 1985, there is no need to consider the retroactivity argument.

er and Singer Associates in two construction projects, the Rehoboth Mall and the Ocean Plaza Mall. Plaintiff is attempting to show that defendants have engaged in a pattern of defrauding general contractors in large construction projects. On a second level, plaintiff has attempted to describe a pattern of racketeering activity which took place solely during the course of the Rehoboth Mall project. Plaintiff describes defendants' several fraudulent misrepresentations during the course of negotiating the contracts and extras. Plaintiff also details the USF & G lawsuit which arose from the Rehoboth disputes.

### (a) The Ocean Plaza Mall.

■ We will first examine plaintiff's allegations regarding the Ocean Plaza Mall. Here, plaintiff's only allegation is that Singer misrepresented Knott's obligations under the construction contract during negotiations. In his affidavit, McGuinness, Knott's president, does not claim that he was defrauded, nor does he claim any intentional misrepresentation on the part of Singer. McGuinness simply describes a disagreement regarding contract interpretation. The disagreement was resolved through arbitration. That the Knott Company prevailed on the majority of its claims at arbitration is not evidence that it was a victim of Singer's fraud. Plaintiff, therefore, has described only a contract dispute and not a fraudulent scheme. Unsupported allegations that Singer was duplicitous during contract negotiations do not raise a predicate act claim of fraud. As with general allegations of fraud, fraudulent acts which constitute predicate acts under a RICO claim must be stated with particularity. *Fed.R.Civ.P.* Rule 9(b). *Saporito v. Combustion Engineering, Inc.*, 843 F.2d 666, 673–74 (3d Cir.1988). After extensive discovery, plaintiff still fails to describe the alleged acts of fraud committed in connection with this project. As a result, this court shall not consider the Ocean Plaza project for purposes of this motion.

### (b) The Rehoboth Mall.

■ Plaintiff also argues that a pattern of racketeering activity arose during the course of the Rehoboth Mall project. Plaintiff asserts numerous predicate acts of mail and wire fraud, 18 U.S.C. §§ 1341 and 1343, in the course of negotiating and performing the contract. Plaintiff further claims that the inclusion of the bad faith claim in the USF & G lawsuit constituted a predicate act of extortion under Maryland law. To properly raise a claim of mail or wire fraud, plaintiff must allege, in connection with the use of the mails or wire communications, a scheme or artifice to defraud or to obtain money or property by false pretenses, representations or promises. We will assume for purposes of this motion that plaintiff has properly stated predicate acts of mail and wire fraud in connection with the Change Order Fraud allegations, although not with the Contract Fraud claims since we have granted summary judgment to defendants on this charge. We do not find, however, that plaintiff has properly raised a predicate act of extortion.

Plaintiff submits that the filing of the USF & G suit violated the Maryland extortion statute, which provides:

> Every person who obtains or attempts to obtain by extortion a sum of money, real or personal property or anything of value of $300 or more from any person is guilty of a felony, and upon being convicted thereof, shall be sentenced to imprisonment for not more than ten years or fined not more than $5,000, or both. If the sum of money, property, or thing of value is under $300, the person is guilty of a misdemeanor and upon being convicted thereof, shall be sentenced to not more than 18 months and be fined not more than $500, or both. For the purposes of this section extortion means obtaining property from another, with his consent, induced by wrongful use of actual or threatened force, or violence or by wrongful threat of economic injury. This section does not apply to legitimate efforts by employees or their representatives to obtain certain wages, hours or working conditions. A prosecution for

the felony offense under this section shall be instituted within 5 years after the offense was committed. (1978, ch. 449).

Plaintiff describes the possible strategic advantage the USF & G suit gives to defendants in the ultimate resolution of the Rehoboth Mall disputes. Plaintiff also claims it was harmed because it is obligated to indemnify USF & G and because it cannot obtain bonding from USF & G in future projects. Although the suit has posed potential adverse consequences for plaintiff, plaintiff has provided no case authority, and we find none, to support the theory that filing the suit constituted extortion. If plaintiff determines to seek redress for the suit on the grounds that it was frivolous or made in bad faith, a civil suit in Maryland may become available.

(3) Pattern of Racketeering Activity.

■ We must next ascertain whether plaintiff has alleged a pattern. As predicate acts, we are left only with its allegations of mail and wire fraud in connection with the Rehoboth Mall. Plaintiff claims that these acts of fraud occurred in three "episodes." First, in contract formation, defendants' misrepresentation led to plaintiffs signing the contract forms.[6] Second, in financing the project, the defendants structured the deal fraudulently to obtain tax advantages. Finally, through the alleged Change Order Fraud, defendants induced plaintiff to perform extra work, intending not to pay for it. These episodes have allegedly harmed not only plaintiff, but also Sussex County, the lending institution, and possibly the I.R.S. Further, defendants' fraud purportedly harmed the numerous subcontractors who worked for Moore.[7]

In examining whether plaintiff has alleged a RICO pattern, we note at the outset that the Court of Appeals for the Third Circuit has recently clarified the meaning of a "pattern of racketeering activity."

*See, Marshall–Silver Construction Company v. Mendel*, 835 F.2d 63 (3d Cir.1987); *Barticheck v. Fidelity Union Bank/First National State*, 832 F.2d 36 (3d Cir.1987). In these cases, the Third Circuit interpreted the requirement imposed by the Supreme Court in *Sedima* that a RICO pattern be characterized by the "continuity plus relationship" of the racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985). The *Barticheck* court found that the continuity element does not require plaintiff to allege two distinct schemes of racketeering activity *Barticheck*, 832 F.2d at 39. The *Barticheck* court further found that a scheme need not be open-ended to be continuous. Rather, the temporal open-endedness of a scheme is merely one factor which may point to the existence of a racketeering pattern. *Id.*

In both *Barticheck* and *Marshall–Silver*, the court emphasized that the question of whether a RICO pattern is established requires a careful factual analysis. Salient factors to be examined include, but are not limited to, "the number of unlawful acts, the length of time over which the acts were committed, the similarity of the acts, the number of victims, the number of perpetrators, and the character of the unlawful activity." *Barticheck*, 832 F.2d at 39.

Applying these factors, the court in *Barticheck* found that a pattern of racketeering activity had been properly alleged in a single investment scheme. The court reasoned that the allegedly fraudulent investment scheme had been perpetrated by two separate business entities and several individuals. 832 F.2d at 39. The misrepresentations were repeated to more than twenty investors. *Id.* To characterize this conduct as a pattern of fraudulent activity, the court reasoned, certainly comported with the ordinary understanding of the term. *Id.*

---

6. As we have noted in Section II D, defendants' motion for summary judgment as to this fraud claim will be granted, thereby also removing this "episode" as a predicate act.

7. Other than these unsupported allegations, plaintiff has not substantiated any actual harm, caused by defendants, to Sussex County, Bank of New York, or any of the subcontractors. We will not deal further, therefore, with this issue.

In contrast, in *Marshal–Silver*, the Court found that a pattern had not emerged where two defendants had filed an allegedly fraudulent petition requesting that plaintiff be put into involuntary bankruptcy. Plaintiff argued that this scheme arose from a pattern of racketeering activity by describing the discrete elements of the scheme: the defendants allegedly included creditors on the bankruptcy petition without their permission, caused the petition to be filed, gave false testimony at the bankruptcy hearing, falsely publicized the bankruptcy and used the mails to further the scheme. *Marshall–Silver*, 835 F.2d at 65. The court did not accept plaintiff's characterization of the scheme as a series of discrete acts. Rather, in examining the factors which might indicate a pattern, the court found that the case involved "a single victim, a single injury and a single, short-lived scheme with only two active perpetrators." *Id.* at 67.

*Barticheck* and *Marshall–Silver* set forth a broad and flexible standard for finding a RICO pattern. However, this standard will not allow a plaintiff to break down a single criminal event into several stages and deem it a pattern. In applying the *Barticheck* factors, we must remain cognizant that "[t]he target of the RICO statute, as its name suggests, is criminal activity that, because of its organization, duration, and objectives poses, or during its existence posed, a threat of a series of injuries over a significant period of time." *Marshall–Silver*, 835 F.2d at 66–67. *Compare Saporito v. Combustion Engineering, Inc.*, 843 F.2d 666 (3d Cir.1988) (5 perpetrators committing at least 32 acts, which were fraudulent inducements to retire made to at least 32 individuals, over a period of roughly six months constituted a "pattern of racketeering activity") with *Cemar, Inc. v. Nissan Motor Corp. in USA*, 678 F.Supp. 1091, 1105 (D.Del.1988) (one scheme, taking place over an undisclosed period of time, in which Nissan allegedly conspired with Cemar's competitor to coerce Cemar to sell its dealer's franchise to the competitor at below market value, the predicate acts all dealing with notifying various people that Cemar was no longer a dealer, is insufficient to constitute a pattern of racketeering activity).

In the present case, we find that plaintiff describes a single scheme to defraud the general contractor of a construction project. This scheme is purported to include three episodes. However, we have eliminated the first episode by granting defendants' motion for summary judgment as to the Contract Fraud allegations. The second so-called episode, the fraudulent structuring of the financing of the project in order to obtain tax advantages, is partially eliminated by our ruling on the Contract Fraud episode and partially subsumed into the third episode, the Change Order Fraud. To expand upon the above, the structuring of the financing is eliminated as to the construction contracts which plaintiff entered into because we have found no fraud. Insofar as the defendants may have obtained the tax free status for the interest on the bond through a false or inaccurate presentation to Sussex county or the Bank of New York of the expected costs, the defendants injured only themselves; this is so because the loss of the tax free status would rebound back upon defendants through the increase in the interest which Rehoboth LP would then have to pay to the Bank of New York. It is only if defendants attempted to avoid exceeding the $10,000,000 limitation, by inducing plaintiff to perform work for which defendants intended that plaintiff would not be paid, that we are faced with possible predicate acts of fraud. It is that scenario which brings us to the third possible episode, the Change Order Fraud. As we have already noted the Charge Order Fraud arose from a single telephone conversation between Richard Singer and Randy Radish.

Construction work on the project actually got under way in May of 1985 (there had been a delay because of the zoning problem faced by the owners). On May 28, 1985, Moore submitted its requisition for work performed in the amount of $319,002. Included in the requisition was a change order request in the amount of $8,442 for some excavation

work necessary to remove and replace unsuitable dirt. Shortly after the requisition was sent, Singer called me by telephone and told me that under no circumstances was Moore to submit any more change orders. Singer also told me by telephone that I was to bill the key tenants directly for any changes. He further said that all of the changes were to be accumulated, and that we would "settle up" at the end of the job. Because I was assured of payment for changes other than as provided in the contract forms, Moore submitted no more change orders for the job.

Affidavit of Randy Radish, June 2, 1987, ¶ 17. According to Radish's affidavit, after that time, key tenants paid directly for some changes, and Rehoboth LP and Sussex LP paid for certain other changes without a change order. However, most of plaintiff's requests for payment for changes were submitted in the spring of 1986. On May 9, 1986, defendant Wharton, a member of the law firm representing defendants, wrote to plaintiff, stating that the claims for extras which plaintiff had recently submitted would not be honored because no change orders for any of this work had been approved.

In essence then, the Change Order Fraud episode, as alleged, is a long scheme by a developer, his corporation and two limited partnerships to defraud a contractor in connection with the construction of one shopping mall. We find that the scheme, if it did take place as plaintiff claims, does not constitute "criminal activity that, because of its organization, duration, and objectives poses, or during its existence posed, a threat of a series of injuries over a significant period of time." *Marshall–Silver*, 835 F.2d at 66–67. For this reason, we find that the activity here does not constitute a pattern. *See Brandt v. Schal Associates, Inc.*, 664 F.Supp. 1193 (N.D.Ill.1987) ("An undertaking by a contractor engaged in a lawful enterprise to bilk one customer in one construction project of finite duration and scope does not satisfy the 'continuity' element of the pattern of racketeering activity."). Because plaintiff does not allege a pattern of racketeering activity, its RICO claims under 18 U.S.C. 1962(a) and (c) must be dismissed.

(4) RICO Conspiracy.

■ Plaintiff's conspiracy claim under 18 U.S.C. 1962(d) must also be dismissed. The heart of a RICO conspiracy is the agreement. Where there is such an agreement, a RICO conspiracy may exist even if the underlying RICO violations of § 1962(a), (b) or (c) were not carried out. *United States v. Alonzo*, 740 F.2d 862, 871–72 (11th Cir. 1984), *cert. denied*, 469 U.S. 1166, 105 S.Ct. 928, 83 L.Ed.2d 939 (1985). Here, we must determine whether the existence of such an agreement has been shown. However, the agreement must go beyond the "mere agreement to commit the predicate acts ... to support a charge of conspiracy under 1962(d)...." *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 792 n. 8 (3d Cir.1984), *cert. denied*, 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985). Rather, a RICO conspiracy must contain an agreement to employ a pattern of racketeering activity or its proceeds for the purpose of violating 18 U.S.C. § 1962(a), (b) or (c). *Hill v. Equitable Bank, N.A.*, 642 F.Supp. 1013, 1020 (D.Del.1986) *later proceeding*, 655 F.Supp. 631 (D.Del.1987), *later proceeding*, 115 F.R.D. 184 (D.Del.1987). Although plaintiff has recited the existence of such an agreement, plaintiff has not described in its pleadings, briefs or supplemental papers the general facts surrounding the formation of the conspiracy and each defendants' general role in the conspiracy. *See, Alfaro v. E.F. Hutton & Co., Inc.*, 606 F.Supp. 1100 (E.D.Pa.1985). Plaintiff cannot state a claim merely by reciting the language of the RICO conspiracy statute and claiming that it has been violated.

For the reasons stated above, defendants' motion for summary judgment on the RICO claims will be granted.