Filed 12/22/2017

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ALBERT KANNO, | |
| Plaintiff and Respondent, | G052348 |
| v. | (Super. Ct. No. 30-2011-00441894) |
| MARWIT CAPITAL PARTNERS II, L.P. et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Orange County, Hugh Michael Brenner, Judge.  (Retired judge of the Orange Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.  Motions for Judicial Notice.  Denied.

Horvitz & Levy, Steven S. Fleischman, Jeremy B. Rosen; Fitzgerald Yap Kreditor, Larry S. Zeman and Eric P. Francisconi for Defendants and Appellants.

Freedman + Taitelman, Michael A. Taitelman, Bradley H. Kreshek; Greines, Martin, Stein & Richland, Robin Meadow and David E. Hackett for Plaintiff and Respondent.

\*          \*          \*

## INTRODUCTION

The question posed by this appeal is whether a claim for breach of an oral agreement was barred by the parol evidence rule. The oral agreement was made in connection with a transaction by which three companies, of which Albert Kanno was the majority shareholder, were sold to two Delaware corporations. The transaction was documented principally by three writings, each of which had an integration clause.

A jury found in favor of Kanno and against Marwit Capital Partners II, L.P. (Marwit Capital) and Marwit Partners, LLC (Marwit LLC) on Kanno's claim for breach of the oral agreement. After the jury rendered its verdict, the trial court concluded the parol evidence rule did not bar Kanno's breach of contract claim and that the oral agreement was enforceable. Marwit Capital and Marwit LLC (together, Marwit) appealed from the judgment.

Resolution of this appeal requires us to consider the parol evidence rule as it applies to the oral agreement under both California law and Delaware law. In Part I of the Discussion section, we address the definition, meaning, and scope of the parol evidence rule under California law and Delaware law and conclude that under Delaware law an integration clause is not conclusive evidence the parties intended their written contract to be their complete agreement.

In Part II of the Discussion section, we apply the parol evidence rule, as formulated in Part I of the Discussion section, to determine whether the three written agreements were intended as partial integrations (final expressions), complete integrations (complete and exclusive statements), or not integrated writings at all. We conclude the three written agreements were at most partial integrations, and, therefore, the oral agreement was enforceable if its terms did not directly contradict and were consistent with those three agreements. In Part II, we also compare the terms of the oral agreement with the terms of the three written agreements and conclude there is no direct contradiction or inconsistency.

2

Because we conclude the oral agreement was not made unenforceable by the parol evidence rule, we do not reach the issue whether that rule applies in an action between a party to the contract and a stranger. For that reason, we deny Kanno's motion for judicial notice, which asked us to consider legislative history materials bearing on that issue, and we deny Marwit's motion for judicial notice, which asked us to consider the appellate record in a Delaware case Marwit cites in support of that issue.[1]

In section III of the Discussion, we conclude that Kanno had standing to sue for breach of the oral agreement. In light of our conclusions, we affirm the judgment.

Finally, we compliment all counsel on the excellent briefing and oral argument in this case.

## FACTS

## I.

## The Parties

Kanno was the majority shareholder of three companies based in Hawaii: Safety Systems Hawaii, Inc. (Safety Systems), Brandy Signs, Inc. (Brandy Signs), and One Shot Supplies, Inc. (One Shot). Safety Systems sold and rented traffic safety devices, Brandy Signs manufactured and installed signs, and One Shot sold screen-printing supplies and equipment.

Marwit Capital is a Delaware limited partnership. Marwit LLC is a Delaware limited liability company and is Marwit Capital's general partner. Marwit Capital is a private equity fund that acquires businesses with funds obtained from

---

[1] Kanno's motion for judicial notice asks that we consider legislative history materials for a 1978 amendment to Code of Civil Procedure section 1856, which is the codification of the parol evidence rule. Marwit's motion for judicial notice asks that we consider the appellate record in *ev3, Inc. v. Lesh* (Del. 2014) 114 A.3d 527, which Marwit cites in support of the proposition that under Delaware law a stranger to a contract may assert the parol evidence rule.

3

institutional investors. Christopher Britt is Marwit Capital's managing partner and is a managing member of Marwit LLC.

## II.

## Negotiations Commence; Kanno Wants an All Cash Sale.

Kanno obtained a majority stake in Safety Systems, Brandy Signs, and One Shot in the early 1980's. Under Kanno's leadership, the revenues of the companies grew from $3 million in 1983 to over $21 million in 2007. Kanno obtained full ownership of the companies in 2004. A few years later, he decided to retire.

Kanno hired an investment bank, CenterPoint M&A Advisors (CenterPoint), to help sell the businesses. CenterPoint circulated to potential buyers a confidential information memorandum stating that Kanno "strongly prefers an all-cash transaction." After receiving the memorandum, Britt expressed interest on behalf of Marwit Capital. In August 2006, Marwit Capital sent Safety Systems, Brandy Signs, and One Shot a letter of intent outlining a proposal based on three core terms: (1) the buyer would be a single-purpose entity formed by Marwit Capital; (2) this entity would acquire the assets of Safety Systems and Brandy Signs, and the "traffic control assets" of One Shot; and (3) the purchase price would be $23 million cash. Kanno was "pretty sure" he signed this letter of intent.

Marwit Capital's anticipated lenders did not like the all-cash proposal. They were concerned that Kanno might not remain involved in the businesses unless he had a financial stake in the acquiring company. Although Marwit Capital knew that Kanno did not want stock, it contacted CenterPoint and asked to restructure the transaction by reducing the cash payment by $5 million and, in its place, providing $5 million of preferred stock in the acquiring entity.

Britt proposed offering Kanno preferred stock with various benefits "as an incentive to get [Kanno] to move forward." Britt sent a revised letter of intent offering to buy Safety Systems, Brandy Signs, and One Shot for $18 million in cash and $5 million

4

in preferred stock. The preferred stock would have a mandatory redemption right three years from closing (a so-called "put" option), an annual dividend rate of 8 percent, which would accrue until redemption, and a tax deferral, meaning Kanno would not pay any taxes on $5 million cash or the dividends until after redemption.

Kanno wanted all cash but agreed to move forward based on the revised letter of intent. He told CenterPoint and Marwit Capital representatives on several occasions that he wanted to "cash out" without putting money at risk and that the right of redemption and tax deferral were important to him.

## III.

### The Parties Agree Upon a Letter of Intent.

In February 2007, after a lull in the negotiations, Britt, on behalf of Marwit Capital, sent a revised letter of intent to CenterPoint offering $20 million in cash and $3 million in preferred stock having an 8 percent dividend, three-year right of redemption, and a tax deferral. Marwit Capital sent another letter of intent dated March 7, 2007 (the March 2007 Letter of Intent) stating that the assets of Safety Systems, Brandy Signs, and One Shot would be purchased by Safety Systems Acquisition Corporation, or a related entity to be formed by Marwit Capital, for a purchase price of $23.5 million. Of the purchase price, $19.5 million would be paid in cash, $1 million would be placed in an escrow account, and $3 million would be paid in the form of class A preferred stock in the acquiring company.

The March 2007 Letter of Intent stated the class A preferred stock would be subject to a three-year mandatory redemption period (that is, the stock would have to be purchased from Kanno within three years) and the stock portion of the transaction would be structured for tax deferral purposes. The March 2007 Letter of Intent stated the transaction would be subject to a "definitive Purchase and Sale Agreement" to be executed by the parties.

5

Once Kanno had signed the March 2007 Letter of Intent on behalf of Safety Systems, Brandy Signs, and One Shot, the parties began negotiating the final transaction terms. Kanno and his companies were represented by the law firm of Sheppard Mullin, while Marwit was represented by the law firm of Paul Hastings.

To facilitate the transaction, Marwit Capital formed two single-purpose Delaware corporations—Traffic Control and Safety Corporation (Traffic Control) and Safety Systems Acquisition Corporation (Systems Acquisition)—to acquire the assets of Safety Systems, Brandy Signs, and One Shot. Marwit Capital and other investors owned all of the stock of Traffic Control, which owned all of the stock of Systems Acquisition. A proposal was made to issue Kanno $3 million of Traffic Control Class A Preferred Stock.

## IV.

### The Oral Stock Redemption Agreement

The parties set a target date of the end of June 2007 for closing the transaction. In May, a problem arose when the parties realized Kanno could not receive both a right of redemption for the shares in Traffic Control and a tax deferral because any repurchase guarantee triggered an immediate taxable event. The parties tried to come up with a solution. Instead of a right of redemption, Marwit Capital proposed making a "gentleman's understanding" to do "the utmost" to redeem the preferred stock after three years. Kanno declined that proposal as being too uncertain. He was "adamant" that he did not want to eliminate the stock redemption and that giving it up was "pretty much a deal breaker."

Stock redemption was a topic of a conference call on June 4, 2007 involving Kanno, Britt, CenterPoint Advisor Scott Berejikian, and another Marwit employee. During the call, Kanno and Britt agreed to increase the cash portion of the purchase price by $500,000 to pay for roof repairs at the Safety Systems building and to decrease the amount of Traffic Control Series A Preferred Stock to be issued to Kanno

6

from $3 million to $2.5 million. They also discussed stock redemption and tax deferral for the $2.5 million in preferred stock. Britt again proposed that he and Marwit Capital would do their "utmost" to purchase the stock at its full value within three years after the deal closed. Kanno rejected that proposal because "[i]t would have to be all, not . . . utmost" and told Brit, "I need to get the money at the end of three years, at least by the end of three years." Britt agreed and stated "he or Marwit would purchase the stock by the end of three years with the 8 percent interest or coupon." Berejikian "reaffirmed" the terms of this oral agreement.

During another conference call a few days later, an attorney mentioned the mandatory redemption issue and advised that the parties could "handle this" by way of "an oral agreement." Berejikian repeated the terms from the prior meeting by stating: "Marwit or [Britt] would purchase the stock back within three years and pay the coupon 8 percent. That way it would be tax deferred." Britt stated: "Okay, Albert, we can take care of that, that's fine. We'll do that." Kanno insisted that Britt "promise this to me." Britt paused and then said, "[o]kay, Albert, I promise." We refer to this oral agreement as the Oral Stock Redemption Agreement.

## V.

### Transaction Agreements: (1) Contribution and Purchase Agreement; (2) Stock Subscription Agreement; and (3) Stockholder Agreement

The transaction closed in June 2007 and was documented in written agreements. The terms of the Oral Stock Redemption Agreement do not appear in the documentation. The attorney who represented Kanno in the transaction testified the documentation did not mention the Oral Stock Redemption Agreement "[b]ecause it was oral."

Three transaction agreements are key: (1) the Contribution and Purchase Agreement, (2) the Stock Subscription Agreement, and (3) the Stockholder Agreement.

7

**Contribution and Purchase Agreement.** Under the terms of the Contribution and Purchase Agreement, Safety Systems agreed to convey all of its assets to Systems Acquisition, Brandy Signs agreed to convey all of its assets to Traffic Control, and One Shot agreed to convey its "traffic control and safety-related assets" to Systems Acquisition, in exchange for $23.5 million (subject to adjustments). The $23.5 million was broken down as follows: (1) $21 million cash paid to Safety Systems; (2) 250,000 shares of Traffic Control Series A Preferred Stock and 51,724 of Traffic Control common stock to be issued to Brandy Signs; and (3) another $1,633,910 in cash paid to Brandy Signs. The Contribution and Purchase Agreement has an integration clause and a California choice-of-law provision.

**Stock Subscription Agreement.** The Stock Subscription Agreement set forth the terms under which Brandy Signs obtained the 250,000 shares of Traffic Control Series A Preferred Stock and 51,724 shares of Traffic Control common stock. The parties to the Stock Subscription Agreement are Brandy Signs and Traffic Control. The Stock Subscription Agreement has a provision stating: "Investor's capital to be invested for an indefinite period of time, possibly without return. It has never been guaranteed or warranted by the Company's management, or any person connected with or acting on the Company's behalf, that Investor will be able to sell or liquidate the Shares in any specified period of time or that there will be any profit to be realized as a result of this investment." The Stock Subscription Agreement has an integration clause and a Delaware choice-of-law provision.

**Stockholder Agreement.** The parties to the Stockholder Agreement were the shareholders of Traffic Control (including Marwit Capital), Kanno, and Brandy Signs. The Stockholder Agreement recites that Kanno and Brandy Signs were purchasing Traffic Control Series A Preferred Stock and common stock and that Marwit Capital and the institutional investors were purchasing Traffic Control Series B Preferred Stock and common stock. The Stockholder Agreement includes a restriction of voluntary transfer

8

of shares by which the Traffic Control stockholders agreed not to transfer shares without first notifying Marwit Capital and Traffic Control and offering each of them the right to purchase the shares (the Right of First Refusal). The Stockholder Agreement has an integration clause and a Delaware choice-of-law of provision.

In addition to these three agreements, Kanno entered into an employment contract by which he agreed to serve as Systems Acquisition's executive. Kanno's real estate investment company leased to Systems Acquisition the facilities that had been used by Safety Systems.

In July 2007, after the transaction had closed, a celebratory dinner was held at Safety Systems's facility in Hawaii. Just before the dinner, Kanno, Britt, and several others met in a conference room. Kanno again asked Britt to "make a commitment and a promise that he'd be taken care of on his preferred stock redemption." Britt replied, "I will take care of it, I promise, Albert."

## VI.

### Kanno Makes Demand on the
### Oral Stock Redemption Agreement.

Following acquisition by Systems Acquisition and Traffic Control, Kanno's former businesses did not perform as expected. The 2008 recession was partly to blame, as were mismanagement and misguided strategy. Kanno, knowing that Systems Acquisition was facing financial difficulty, grew discontented. In April 2009, Kanno received an e-mail from Systems Acquisition's CEO about cutting costs and reducing overtime pay for employees. In response, Kanno tendered his resignation as he did not agree with the way in which the company was being run.

Britt met with Kanno in June 2009 and convinced him to stay on. Stock redemption was a topic of discussion. A month later, Britt and Kanno met again. After the meeting, Kanno sent Britt an e-mail stating: "Thanks for the time you gave me last Wednesday. I am very happy that you will be paying me off in 6/[10] for the A Preferred

9

stock of TCSC. I am counting on this money. As we had agreed when I sold the company to Marwit, which is not in the sales purchase agreement but given to me as your personal word, you would pay me the 2.5 million and the interest accrued on the anniversary in the 3rd year of the purchase of Safety Systems Hawaii." Britt did not immediately respond but later told Kanno, "I can't afford it right now."

Kanno continued working for Systems Acquisition until June 2010, three years after the sale had closed. He asked that Marwit Capital purchase the Traffic Control Series A Preferred Stock that had been issued to Brandy Signs. He received no response. In November 2010, Kanno's lawyer sent a letter to Britt demanding that he or Marwit Capital purchase the Traffic Control Series A Preferred Stock for $2.5 million plus accrued interest. The letter stated: "[I]n May 2007, Marwit entered into an oral agreement with Mr. Kanno, whereby you agreed that either you, individually, Marwit Partners, LLC or Marwit (collectively, the 'Marwit Parties') would purchase the 250,000 shares of Class A Preferred Stock from Mr. Kanno for $2,500,000, plus accrued simple interest at the rate of 8%. We have spoken with several individuals who witnessed this agreement, and they confirmed that it was made." Britt declined to purchase the stock.

## PROCEDURAL HISTORY

Kanno filed this lawsuit against Marwit Capital, Marwit LLC, and Britt in January 2011. The operative pleading was the second amended complaint, which asserted causes of action for breach of oral contract, specific performance, and promise without intent to perform. Marwit filed an answer and cross-complaint seeking declaratory relief as to various issues regarding the enforceability of the oral agreement and Kanno's standing. Kanno's cause of action for specific performance was dismissed on demurrer.

The trial was conducted in two phases. The first phase was a jury trial on Kanno's causes of action for breach of oral contract and fraud. In a special verdict, the

10

jury found for Kanno and against Marwit Capital and Marwit LLC on the breach of oral contract cause of action, and found in favor Marwit Capital and Marwit LLC on the false promise fraud cause of action. The jury found in favor of Britt on both causes of action. The jury found specifically that Kanno had entered into the Oral Stock Redemption Agreement with Marwit Capital and Marwit LLC, that both Marwit Capital and Marwit LLC had breached the contract, and that, as a result of the breach, Kanno had suffered damages of $2.5 million plus 8 percent interest.

The second phase of the trial was a bench trial on equitable and legal defenses raised by Marwit, including Kanno's standing to sue and the effect of the integration clauses. New evidence was not presented; instead, the parties presented briefs addressing the issues and relied on the evidence presented during the first phase of trial.

The trial court ruled in favor of Kanno and issued a statement of decision making findings on five principal controverted issues. The findings relevant to this appeal are: (1) the integration clauses in the Contribution and Purchase Agreement, the Stock Subscription Agreement, and the Stockholder Agreement do not bar enforcement of the Oral Stock Redemption Agreement; (2) the Oral Stock Redemption Agreement was legal and enforceable; and (3) Kanno had standing to enforce the Oral Stock Redemption Agreement. As to the first issue, the court found the parties "did not intend for [the written agreements] to be the final and complete expression of the parties' agreement" and "the parties contemplated that there could be additional agreements, as long as the subject of those agreements was not explicitly comprehended within the particular documents." No objections were made to the statement of decision and no omissions in it were brought to the court's attention.

The judgment awards Kanno contract damages of $3.1 ($2.5 million plus accrued dividends of $600,000), prejudgment interest in the amount of $1.494 million through April 24, 2015, and prejudgment interest at the rate of about $850 a day from April 24, 2015 to the date of entry of judgment.

11

## DISCUSSION

### I.

### The Parol Evidence Rule Under California Law and Delaware Law

A. *California Law:  Applicable to Contribution and Purchase Agreement*

The Contribution and Purchase Agreement is governed by California law. California's parol evidence rule is codified in section 1856 of the Code of Civil Procedure (section 1856).  Subdivision (a) of section 1856 provides:  "Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to the terms included therein may not be contradicted by evidence of a prior agreement or of a contemporaneous oral agreement."  Subdivision (b) of section 1856 provides:  "The terms set forth in a writing described in subdivision (a) may be explained or supplemented by evidence of consistent additional terms unless the writing is intended also as a complete and exclusive statement of the terms of the agreement."

Section 1856 creates two levels of contract integration or finality:  (1) the parties intended the writing to be the final expression of their agreement; and (2) the parties intended the writing to be the complete and exclusive statement of the terms of their agreement.[2]

If a writing falls within level 1 (the writing is a final expression) then a prior or contemporaneous oral agreement is admissible if it does not contradict the writing, and evidence of consistent additional terms may be used to explain or supplement the writing.  (§ 1856, subd. (a).)  "Thus, a prior or contemporaneous collateral oral agreement relating to the same subject matter may sometimes be admitted

---

[2] This two-level formulation is essentially the same as that of the Restatement Second of Contracts.  Section 210(1) of the Restatement Second of Contracts defines a "completely integrated agreement" as one "adopted by the parties as a complete and exclusive statement of the terms of the agreement," and section 210(2) defines a "partially integrated agreement" as one "other than a completely integrated agreement."

in evidence.  However, this is true only where it is consistent with the terms of the integration."[3]  (*Hayter Trucking, Inc. v. Shell Western E&P, Inc.* (1993) 18 Cal.App.4th 1, 14.)

If a writing falls within level 2 (complete and exclusive statement) then evidence of consistent additional terms may not be used to explain or supplement the writing.  (§ 1856, subd. (b).)  As stated by Justice Traynor in *Masterson v. Sine* (1968) 68 Cal.2d. 222, 225, "[w]hen the parties to a written contract have agreed to it as an 'integration'—a complete and final embodiment of the terms of an agreement—parol evidence cannot be used to add to or vary its terms."[4]  (See *Pacific State Bank v. Greene* (2003) 110 Cal.App.4th 375, 384, fn. 3 ["The guaranty agreements here clearly qualified as a final, complete, and exclusive statement of the terms of the agreement.  Thus, their terms could not be contradicted by parol evidence pursuant to section 1856, subdivision (a), or supplemented by evidence of 'consistent additional terms' pursuant to section 1856, subdivision (b)"].)

Some clarification of terms is in order.  Case law sometimes uses the term "integration" to mean a complete integration, i.e., the second level of integration.  Justice Traynor did so in *Masterson v. Sine, supra*, 68 Cal.2d at page 225.  To be consistent with

---

[3] The rule of the Restatement Second of Contracts is the same.  Under the Restatement, if an agreement is partially integrated, but not completely integrated, then:  (1) prior or contemporaneous agreements are discharged to the extent they are inconsistent with the integrated agreement (Rest.2d Contracts, § 213(1)); (2) evidence of prior or contemporaneous oral agreements is not admissible to contradict the writing (*id.*, § 215); and (3) evidence of a consistent additional term is admissible to supplement the integrated agreement (*id.*, § 216(1)).

[4] The rule of the Restatement Second of Contracts is the same here too.  Under the Restatement, if an agreement is completely integrated, then:  (1) prior or contemporaneous agreements *regardless of consistency* are discharged to the extent they are within the scope of the completely integrated agreement (Rest.2d Contracts, § 213(2)); (2) evidence of prior or contemporaneous oral agreements is not admissible to contradict the writing (*id.*, § 215); and (3) evidence of both consistent and inconsistent additional terms is not admissible to supplement the integrated agreement (*id.*, § 216(1)).

13

California statute, we use the term "final expression" to mean the level of integration referred to in section 1856, subdivision (a), and the term "complete and exclusive statement" to mean the level of integration referred to in section 1856, subdivision (b). A final expression corresponds to a partially integrated agreement under section 210(2) of the Restatement Second of Contracts, and a complete and exclusive statement corresponds to a completely integrated agreement under section 210(1) of the Restatement Second of Contracts.

"The crucial issue in determining whether there has been an integration is whether the parties intended their writing to serve as the exclusive embodiment of their agreement." (*Masterson v. Sine*, *supra*, 68 Cal.2d at p. 225.) Under California law, the presence of an integration clause in the contract is not conclusive but is a factor which "may help resolve" that issue. (*Ibid*.) "In considering whether a writing is integrated, the court must consider the writing itself, including whether the written agreement appears to be complete on its face; whether the agreement contains an integration clause; whether the alleged parol understanding on the subject matter at issue might naturally be made as a separate agreement; and the circumstances at the time of the writing." (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 953-954 (*Founding Members*).)

On the issue of contract integration, "'the court must consider not only whether the written instrument contains an integration clause, but also examine the collateral agreement itself to determine whether it was intended to be a part of the bargain. [Citations.] However, in determining the issue of integration, the collateral agreement will be examined only insofar as it does not directly contradict an express term of the written agreement; "it cannot reasonably be presumed that the parties intended to integrate two directly contradictory terms in the same agreement." [Citation.] In the case of prior or contemporaneous representations, the collateral agreement must be one which might naturally be made as a separate contract, i.e., if in fact agreed upon need not

14

certainly have appeared in writing.'" (*Banco Do Brasil, S.A. v. Latian, Inc.* (1991) 234 Cal.App.3d 973, 1003 (*Banco Do Brasil*), overruled on other grounds in *Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1182.)

"Whether a contract is integrated is a question of law when the evidence of integration is not in dispute." (*Founding Members*, *supra*, 109 Cal.App.4th at p. 954; *EPA Real Estate Partnership v. Kang* (1992) 12 Cal.App.4th 171, 176.) If the issue of integration requires a resolution of a conflict in the evidence or of credibility, then the trial court's determination is reviewed under the substantial evidence standard. (*Heller v. Pillsbury Madison & Sutro* (1996) 50 Cal.App.4th 1367, 1382; *Haggard v. Kimberly Quality Care, Inc.* (1995) 39 Cal.App.4th 508, 517, fn. 4.)

B. *Delaware Law: Applicable to Stock Subscription Agreement and the Stockholder Agreement*

The Stock Subscription Agreement and the Stockholder Agreement each has a Delaware choice-of-law provision. California courts enforce contractual choice-of-law provisions if the chosen state has a substantial relationship to the parties or the transaction, or if there is any other reasonable basis for the parties' choice of law, and the chosen state's law is not contrary to a fundamental policy of California. (*Nedlloyd Lines B.V. v. Superior Court* (1992) 3 Cal.4th 459, 466.) "California strongly favors enforcement of choice-of-law provisions." (*Harris v. Bingham McCutchen LLP* (2013) 214 Cal.App.4th 1399, 1404.) Marwit Capital, Marwit LLC, and Traffic Control are Delaware Corporations. All three are parties to the Stock Subscription Agreement and the Stockholder Agreement. This is a reasonable basis for the parties' choice of Delaware law. (*Nedlloyd Lines B.V. v. Superior Court*, *supra*, 3 Cal.4th at p. 467.)

What is Delaware's parol evidence rule? According to Kanno, it is the same as California's rule. According to Marwit, Delaware's rule is significantly different because it makes an integration clause conclusive evidence that the parties intended the

15

written contract to be their complete agreement.  We conclude that under Delaware law an integration clause creates a rebuttable presumption the contract is integrated.

Delaware law generally follows the two-level formulation of integration found under California law and the Restatement Second of Contracts.  Under Delaware law, "[t]he parol evidence rule excludes evidence of additional terms to a written contract, when that contract is a *complete* integration."  (*Husband (P.J.O.) v. Wife (L.O.)* (Del. 1980) 418 A.2d 994, 996, italics added.)  "The parol evidence rule bars the admission of evidence extrinsic to an unambiguous, integrated written contract for the purpose of varying or contradicting the terms of that contract."  (*Galantino v. Baffone* (Del. 2012) 46 A.3d 1076, 1081.)  "The parol evidence rule[] bars admission of extrinsic evidence that contradicts or supplements the terms of a contract *only* if the contract is *completely* integrated."  (*McKinney Family L.P. v. Stubbs* (Del. July 2, 2007, No. 510, 2006) 931 A.2d 1006, 2007 Del. Lexis 291, p. *6, italics added.)

On the issue whether a contract is integrated, the Delaware Court of Chancery in *Carrow v. Arnold* (Del. Ct. of Chancery, Oct. 31, 2006, No. 182-K) 2006 Del.Ch. Lexis 191, pages *15-*16, affd. 2007 Del. Lexis 397 (Del. 2007) (*Carrow*)[5] stated:  "When determining whether a written contract is the final expression of the parties' agreement, a court should consider the facts and circumstances surrounding the execution of the instrument.  Some of the factors a court should consider are:  the intent of the parties, where such intent is discernible; the language of the contract itself and whether it contains an integration clause; whether the instrument was carefully and formally drafted; the amount of time the parties had to consider the terms of the contract; whether the parties bargained over specific terms; and whether the contract addresses

---

[5] Unpublished Delaware opinions may be cited under Delaware Supreme Court rule 14(b)(vi)(B)(2).  In Delaware, unpublished opinions are "not necessarily *stare decisis*" but warrant great deference.  (*Aprahamian v. HBO & Co.* (Del. 1987) 531 A.2d 1204, 1207.)

16

questions that naturally arise out of the subject matter." (Fns. omitted.) This is nearly the same as the California rule. The Court of Chancery, noting the contract in question did not have an integration clause, added that "[s]uch a clause would create a presumption of integration." (*Id*. at p. *16.)

In support of the last statement, the *Carrow* court cited *Johnson v. Reno* (D.D.C. 1996) 1996 U.S. Dist. Lexis 5347, page *22 ["A presumption exists that a written contract contains all of the parties' terms, and the presence of an integration clause strengthens that presumption"] and *Telecom Intern. America, Ltd. v. AT&T Corp.* (2d Cir. 2001) 280 F.3d 175, which applied New Jersey law.

The Delaware Court of Chancery cited *Carrow* with approval in *Rhodes v. Silkroad Equity, LLC* (Del. Ct. of Chancery, July 11, 2007, No. 2133) 2007 Del.Ch. Lexis 96 (*Rhodes*), and treated an integration clause as creating a presumption a contract was integrated. (*Id.* at pp. *23-*24.) The *Rhodes* court stated that "[i]ntegration clauses do not, as a matter of law, bar claims of fraud and the presumption afforded by such clauses can also be rebutted upon a showing of bad faith." (*Id.* at p. *24.) The Delaware Court of Chancery cited *Carrow* again in *Addy v. Piedmonte* (Del. Ct. of Chancery, Nov. 18, 2009, No. 3571) 2009 Del.Ch. Lexis 38 (*Addy*) for the proposition that "[c]lauses indicating that the contract is an expression of the parties' final intentions generally create a presumption of integration." (*Id.* at p. *29.) The Court of Chancery stated that "[c]ourts . . . may consider extrinsic evidence to discern if the contract is completely or partially integrated" and, in considering whether a contract is integrated, "the court focuses on whether it is carefully and formally drafted, whether it addresses the questions that would naturally arise out of the subject matter, and whether it expresses the final intentions of the parties." (*Ibid.*, fns. omitted.)

Marwit relies primarily on a federal case, *J.A. Moore Constr. Co. v. Sussex Associates Ltd.* (D.Del. 1988) 688 F.Supp. 982 (*J.A. Moore*) for the proposition that under Delaware law an integration clause is conclusive evidence the parties intended the

17

written contract to be the complete agreement. In *J.A. Moore*, *supra,* at page 987, the court concluded that two contracts were fully integrated because each had an integration clause. "The existence of such a clause in a formal written contract between sophisticated parties is, in the absence of unconscionable or other extraordinary circumstances, conclusive evidence that the parties intended the written contract to be their complete agreement." (*Ibid.*) In support of that proposition, the *J.A. Moore* court did not cite Delaware authority but cited the 1982 edition of the Farnsworth treatise on contracts. (*Ibid.*)

In *Progressive Int'l Corp. v. E.I. du Pont de Nemours & Co.* (Del. Ct. of Chancery, July 9, 2002, No. 19209) 2002 Del.Ch. Lexis 91 (*Progressive*), the Delaware Court of Chancery cited *J.A. Moore* in support of the proposition that "[a]bsent fraud or other unconscionable circumstances not present here, the existence of an integration clause between sophisticated parties is conclusive evidence that the parties intended the written contract to be their complete agreement." (*Id.* at p. *24, fns. omitted.) In *Newport Disc, Inc. v. Newport Electronics, Inc.* (Del. Super. Ct., Mar. 11, 2013, No. N12C-10-228 MMJ CCLD) 2013 Del.Super. Lexis 51, page *12, a Delaware trial court quoted and relied on the above-quoted passage from *Progressive*.

These authorities offer three different rules regarding the effect of an integration clause under Delaware law: (1) the clause creates a presumption of integration that may be rebutted by extrinsic evidence of the parties' intent; (2) the clause creates a presumption of complete integration that may be rebutted only by evidence of fraud or breach of fiduciary duty; or (3) the clause creates a conclusive presumption of complete integration.

As far as we can tell, the Delaware Supreme Court has not resolved the issue of the effect of an integration clause. However, we have three important clues as to what the Delaware Supreme Court might do. First, in formulating the parol evidence rule, the Delaware Supreme Court has cited and followed the Restatement Second of

18

Contracts. (See, e.g., *ev3, Inc. v. Lesh, supra*, 114 A.3d at p. 538, fn. 32 [citing Rest.2d Contracts, § 215)]; *Galantino v. Baffone, supra,* 46 A.3d at p. 1081, fn. 9 [citing Rest.2d Contracts, § 213, com. a, p. 129]; *Phillips v. Wilks, Lukoff & Bracegirdle, LLC* (Del., Oct. 14, 2014, No. 671,2013) 2014 Del. Lexis 449, p. *11, fn. 15 [citing Rest.2d Contracts, § 213, com. a]; *Klair v. Reese* (Del. 1987) 531 A.2d 219, 223 [citing Rest.2d Contracts, § 212(1)].) It seems likely the Delaware Supreme Court would also follow the Restatement on the issues of integration and the effect of an integration clause.

Second, in *Otto v. Gore* (Del. 2012) 45 A.3d 120, 131, the Delaware Supreme Court cited *Addy, supra*, 2009 Del.Ch. Lexis 38 with approval in holding that parol evidence was admissible to determine whether a valid, enforceable trust had been formed. Although *Otto v. Gore* was not a contract case and did not address the effect of an integration clause in determining whether a contract was integrated, the Delaware Supreme Court did not criticize *Addy* or distinguish it on that ground.

Third, *J.A. Moore*, and therefore *Progressive* and *Newport Disc, Inc. v. Newport Electronics, Inc.* too, relied on section 7.3 of the 1982 edition of *Farnsworth on Contracts* for the proposition that an integration clause is conclusive on the issue of integration. But the later edition of *Farnsworth on Contracts* acknowledges the trend in authority is toward considering extrinsic evidence to determine whether a contract is completely or partially integrated: "According to Corbin, account should always be taken of all circumstances, including evidence of prior negotiations, since the completeness and exclusivity of the writing cannot be determined except in the light of those circumstances. 'The writing cannot prove its own completeness and accuracy.' The trend clearly favors Corbin. The Restatement Second commentary agrees that 'a writing cannot of itself prove its own completeness, and wide latitude must be allowed for inquiry into circumstances bearing on the intention of the parties.'" (II *Farnsworth on Contracts* (3d ed. 2004) § 7.3, p. 231.)

19

Therefore, we believe the Delaware parol evidence rule is the one expressed in the Second Restatement of Contracts. Section 209(3) declares: "Where the parties reduce an agreement to a writing which in view of its completeness and specificity reasonably appears to be a complete agreement, it is taken to be an integrated agreement unless it is established by other evidence that the writing did not constitute a final expression." (Rest.2d Contracts, § 209(3).) Section 209(3) thus creates a rebuttable presumption of a partial integration, which is consistent with *Carrow*, *Rhodes*, and *Addy*.

On the effect of an integration clause, comment b to section 209 of the Second Restatement of Contracts states, "[w]ritten contracts, signed by both parties, may include an explicit declaration that there are no other agreements between the parties, but such a declaration may not be conclusive." Comment c, page 116 to section 209 adds this: "Whether a writing has been adopted as an integrated agreement is a question of fact to be determined in accordance with all relevant evidence. The issue is distinct from the issues whether an agreement was made and whether the document is genuine, and also from the issue whether it was intended as a complete and exclusive statement of the agreement." The Reporter's note to comment b cites authority for the proposition that an integration clause is not conclusive, but is only a factor to be considered. (Rest.2d Contracts, § 209, reporter's note, p. 117.) As to proof of whether an agreement is completely integrated, comment b, page 113 to section 210 states: "That a writing was or was not adopted as a completely integrated agreement may be proved by any relevant evidence. A document in the form of a written contract, signed by both parties and apparently complete on its face, may be decisive of the issue in the absence of credible contrary evidence. But a writing cannot of itself prove its own completeness, and wide latitude must be allowed for inquiry into circumstances bearing on the intention of the parties." (Rest.2d Contracts, § 210, com. b, p. 118.)

We conclude that under Delaware law, when the parties reduce their agreement to a writing that appears to be a complete agreement, a presumption of

20

integration arises. This presumption may be rebutted by extrinsic evidence showing the parties did not intend the writing to be the final expression of their agreement. The presence in the writing of an integration clause is not conclusive on the issue of integration, but is a factor to be considered. If a written contract is a partially integrated agreement, then parol evidence of additional and consistent prior contemporaneous oral agreements is admissible.

Marwit suggests that, if we have any concerns about Delaware law on the issue of the effect of an integration clause, we ask the California Supreme Court to certify the issue to the Delaware Supreme Court under Rule 41 of the Rules of the Supreme Court of the State of Delaware.[6] It is not necessary to do so because it is clear to us the Delaware Supreme Court has followed and would follow the Restatement Second of Contracts.

## II.

### Applying the Parol Evidence Rule to the
### Oral Stock Redemption Agreement

A. *Introduction and Standard of Review*

Are the Contribution and Purchase Agreement, the Stock Subscription Agreement, and the Stockholder Agreement (1) the "final expression[s]" of the parties' agreement, (2) the "complete and exclusive statement[s]" of the parties' agreement, or (3) neither the "final expression" nor the "complete and exclusive statement" of the parties' agreement (a nonintegrated agreement)? (See Code Civ. Proc., § 1856, subds. (a), (b).)

---

[6] Rule 41(a)(ii) of the Rules of the Supreme Court of the State of Delaware states in relevant part: "[T]he Highest Appellate Court of any other State, . . . may, on motion or *sua sponte*, certify to this Court for decision a question or questions of law arising in any matter before it prior to the entry of final judgment or decision if there is an important and urgent reason for an immediate determination of such question or questions by this Court and the certifying court or entity has not decided the question or questions in the matter."

21

Here, the trial court made a finding that it had independently reviewed the evidence from the jury trial and agreed with the jury's findings. The court found that none of the three agreements was intended to be the "final and complete expression of the parties' agreement." We construe that statement as a finding that none of the three agreements was integrated at any level; that is, the parties did not intend the Contribution and Purchase Agreement to be the final expression of their agreement or the complete and exclusive statement of the terms of their agreement.

We review that finding, to the extent the evidence is in dispute or requires a resolution of witness credibility, for substantial evidence. (*Founding Members*, *supra*, 109 Cal.App.4th at p. 956; *Heller v. Pillsbury Madison & Sutro*, *supra*, 50 Cal.App.4th at p. 1382.) Marwit did not bring any ambiguities or omissions in the statement of decision to the trial court's attention. We therefore infer the trial court made all implied factual findings favorable to Kanno on all issues necessary to support the judgment, and we review those implied findings under the substantial evidence standard. (*Fladeboe v. American Isuzu Motors, Inc.* (2007) 150 Cal.App.4th 42, 59-60.)

B. *Contribution and Purchase Agreement and Opinion Letter*

1. Contribution and Purchase Agreement.

The issue of contract integration may be analyzed by addressing four questions: "(1) does the written agreement appear on its face to be a complete agreement; obviously, the presence of an 'integration' clause will be very persuasive, if not controlling, on this issue; (2) does the alleged oral agreement directly contradict the written instrument; (3) can it be said that the oral agreement might naturally have been made as a separate agreement or, to put it another way, if the oral agreement had been actually agreed to, would it certainly have been included in the written instrument; and (4) would evidence of the oral agreement be likely to mislead the trier of fact." (*Banco Do Brasil*, *supra*, 234 Cal.App.3d at pp. 1002-1003.)

22

We start by asking whether the Contribution and Purchase Agreement appears on its face to be a final expression of the parties' agreement with respect to the terms included in that agreement. (*Founding Members*, *supra*, 109 Cal.App.4th at p. 953; *Banco Do Brasil*, *supra*, 234 Cal.App.3d at p. 1002.) The Contribution and Purchase Agreement appears to be so. It is lengthy, formal, detailed, signed by all of the parties, and has an integration clause.[7] The integration clause is a factor, and persuasive, but it is not controlling. To determine whether the Contribution and Purchase Agreement is the final expression or the complete and exclusive statement of the parties' agreement, we must look beyond the four corners of the agreement.

What immediately strikes us in addressing the matter of contract integration is that at least two other written agreements—the Stock Subscription Agreement and the Stockholder Agreement—are parts of the transaction. The parties to the Contribution and Purchase Agreement are Systems Acquisition, Traffic Control, Safety Systems, Brandy Signs, One Shot, and Kanno. The parties to the Stock Subscription Agreement are Brandy Signs and Traffic Control. The parties to the Stockholder Agreement are the shareholders of Traffic Control (including Marwit Capital), Kanno, and Brandy Signs. Kanno and Brandy Signs are parties to all three agreements. Traffic Control is a party to two of the agreements. The parties intended all the agreements to be binding and enforceable and all relate to the same transaction. The presence of three agreements therefore is persuasive evidence the parties did not intend the Contribution and Purchase Agreement to be the "complete and exclusive statement" of the parties' agreement.

We also look to the circumstances which led to the Contribution and Purchase Agreement and the terms of the Oral Stock Redemption Agreement. (*Founding*

---

[7] The Contribution and Purchase Agreement's integration clause states: "This Agreement, which includes the Schedules and the Exhibits hereto, contains the entire agreement between the parties hereto with respect to the transactions contemplated by this Agreement and supersedes all prior arrangements or understandings with respect thereto."

23

*Members*, *supra*, 109 Cal.App.4th at pp. 953-954; *Banco Do Brasil*, *supra*, 234 Cal.App.3d at p. 1002.) Kanno wanted an all-cash deal. The confidential information memorandum distributed by CenterPoint stated that Kanno "strongly prefers an all-cash transaction." Marwit's anticipated lenders opposed an all-cash proposal because they wanted Kanno to have a stake in the business after the sale. The revised letter of intent offered $18 million cash and $5 million in preferred stock with a right of redemption after three years, a dividend rate of 8 percent, and a tax deferral. Kanno wanted all cash but he agreed to go forward based on the revised letter of intent.

During the course of negotiations, the purchase price went up to $23.5 million, of which $19.5 million was in cash, $1 million would be placed in escrow, and $3 million would paid in preferred stock. The sticking point became the tax deferral. All parties realized Kanno could not receive both a right of redemption of the shares of preferred stock and a tax deferral because the redemption guarantee would trigger an immediate taxable event. The parties tried to come up with a solution. The cash portion of the purchase price was increased by $500,000 and the amount of preferred stock decreased to $2.5 million. Kanno rejected proposals that Marwit and Britt would do their "utmost" to repurchase the preferred stock.

The matter came to a head at the conference calls in June/July 2007. During the first call, Kanno told Brit, "I need to get the money at the end of three years, at least by the end of three years." Britt agreed. He stated: "[H]e would purchase the stock, he or Marwit would purchase the stock by the end of three years with the 8 percent interest or coupon. And [Kanno would] be tax deferred that way." Berejikian "reaffirmed" the terms of this oral agreement. During the second call, a few weeks later, an attorney mentioned the mandatory redemption issue and advised that the parties could "handle this" by way of "an oral agreement." Berejikian repeated the terms from the prior meeting: "Marwit or [Britt] would purchase the stock back within three years and pay the coupon 8 percent. That way it would be tax deferred." Britt stated: "Okay,

24

Albert, we can take care of that, that's fine. We'll do that." Kanno insisted that Britt "promise this to me." Britt paused and then said, "[o]kay, Albert, I promise."

The evidence supports a finding that the parties intended the terms of the Oral Stock Redemption Agreement to be part of their agreement. The Oral Stock Redemption Agreement was the means by which the parties could resolve the tension among three apparently conflicting desires: (1) Kanno's desire for an all-cash deal; (2) Marwit's desire to make sure that Kanno had a financial stake in the acquiring company after the sale; and (3) Kanno's desire to avoid an immediately taxable event.

The evidence also supports a finding that the Oral Stock Redemption Agreement naturally would be a separate agreement and would not have been included in the writing. (*Founding Members*, *supra*, 109 Cal.App.4th at pp. 953-954; *Banco Do Brasil*, *supra*, 234 Cal.App.3d at pp. 1002-1003.) Kanno apparently believed he could avoid an immediate taxable event by having stock redemption expressed in a separate oral agreement instead of including it in the Contribution and Purchase Agreement. Regardless whether Kanno was mistaken in that belief, he did believe it, and his stated belief and desire, which is supported by substantial evidence, shows that the Oral Stock Redemption Agreement would naturally be separate from the Contribution and Purchase Agreement. Further, "even in situations where the court concludes that it would not have been natural for the parties to make the alleged collateral oral agreement, parol evidence of such an agreement should nevertheless be permitted if the court is convinced that the unnatural actually happened in the case being adjudicated." (*Masterson v. Sine*, *supra,* 68 Cal.2d at p. 228, fn. 1.)

We also consider the whether Oral Stock Redemption Agreement "directly contradict[s]" the Contribution and Purchase Agreement. (*Banco Do Brasil*, *supra*, 234 Cal.App.3d at p. 1003.) Section 1.2 of Contribution and Purchase Agreement sets forth the purchase price and payment terms by which Safety Systems, Brandy Signs, and One Shot agreed to sell their assets to Systems Acquisition or Traffic Control. Section 1.2

25

states that as additional consideration for Brandy Sign's assets, Traffic Control will deliver to Brandy Signs 250,000 shares of Traffic Control Series A Preferred Stock and 51,724 shares of Traffic Control common stock. Section 1.2 is silent on the issue of future redemption by Traffic Control of the shares of preferred stock. Section 1.2 does not mention the Stock Subscription Agreement or the Stockholder Agreement.

Marwit argues the Oral Stock Redemption Agreement is inconsistent with the Contribution and Purchase Agreement because the Oral Stock Redemption Agreement alters the total purchase price by adding $3.1 million of additional consideration. There is no inconsistency. The purchase price is as it says in section 1.2 of the Contribution and Purchase Agreement—$23.5 million. Section 1.2 states that as consideration for the assets of Brandy Signs, Traffic Control will deliver the shares of preferred stock and $1,633,910 in cash to Brandy Signs. Those shares, going forward, have whatever value they might later have. Not only is the Contribution and Purchase Agreement silent on the matter of future redemption of the shares of preferred stock, the parties to the Oral Stock Redemption Agreement are Kanno and Marwit Capital, which is not a party to the Contribution and Purchase Agreement. Thus, Marwit Capital's agreement to purchase Traffic Control shares at a later date with 8 percent interest does not alter the amount of consideration paid by Systems Acquisition and Traffic Control. The Oral Stock Redemption Agreement does not directly contradict the Contribution and Purchase Agreement.

Finally, we ask whether evidence of the Oral Stock Redemption Agreement was likely to have misled the jury. (*Masterson v. Sine*, *supra*, 68 Cal.2d at p. 227; *Banco Do Brasil*, *supra*, 234 Cal.App.3d at p. 1003.) We infer the trial court made an implied finding that such evidence did not likely mislead the jury. The testimony regarding the Oral Stock Redemption Agreement was in conflict and the jury had to resolve those conflicts and assess witness credibility. But conflicts in the evidence does not mean the jury likely was misled. We routinely entrust juries with the responsibility to resolve such

26

conflicts and assess witness credibility. The trial court, which presided over the jury trial and independently reviewed the evidence from that trial, impliedly found the evidence of the Oral Stock Redemption Agreement did not likely mislead the jury. Our review of the record does not lead us to a different conclusion.

We conclude the Contribution and Purchase Agreement was not intended as a complete and exclusive statement of the terms of the parties' agreement. Although it also might be that the Contribution and Purchase Agreement was not even a final expression of their agreement, we need not go that far. Because the Contribution and Purchase Agreement was not intended as a complete and exclusive statement, evidence of the Oral Stock Redemption Agreement was admissible as a separate oral agreement or to supplement the Contribution and Purchase Agreement with additional terms. (Code Civ. Proc., § 1856, subds. (a), (b).)

2. Opinion Letter

Section 5.1(m) of the Contribution and Purchase Agreement provides that, as a condition to closing, "Purchaser shall have received" an opinion letter from Kanno's "special Hawaii counsel" and an opinion letter from Kanno and his companies' transactional counsel. The opinion letters were made exhibits F and G respectively to the Contribution and Purchase Agreement. Kanno's counsel produced an opinion letter dated June 29, 2007 (apparently this single letter served as both exhibits F and G) and Kanno signed a certificate consenting to delivery of the opinion letter and certifying that his counsel was authorized to rely on the certificate in preparing and delivering the opinion letter.

Among other things, the opinion letter makes this representation: "We also assumed that there are no extrinsic agreements or understandings among the parties to the Transaction Documents that would modify or interpret the terms of the Transaction Documents or the respective rights or obligations of the parties thereunder." Marwit argues this representation in the opinion letter is inconsistent with the Oral Stock

27

Redemption Agreement because it is such an extrinsic agreement. While that appears to be true at first glance, closer examination of the opinion letter reveals no inconsistency. The opinion letter specifically defines the term "Transaction Documents" to mean three writings: (1) a "Purchase Agreement" dated June 29, 2007 executed by Safety Systems, Brandy Signs, One Shot, Kanno, Systems Acquisitions, and Traffic Control; (2) an "Escrow Agreement" executed by Safety Systems, Brandy Signs, One Shot, Kanno, and Comerica Bank; and (3) an "Employee Service Agreement" executed by Safety Systems, Brandy Signs, One Shot, Kanno, and Systems Acquisitions.

Neither Marwit Capital nor Marwit LLC is a party to any of the three writings comprising the Transaction Documents. The parties to the Oral Stock Redemption Agreement are Kanno, Marwit Capital, and Marwit LLC. Thus, the Oral Stock Redemption Agreement would not be an extrinsic agreement or understanding among the parties to the Transaction Documents.

This is, we acknowledge, is a technical reading of the Transaction Documents. The parties to the transaction were, however, represented by large, competent law firms which drafted lengthy and highly detailed documents using very technical language and unambiguous, precisely-defined terms. The terms used in the opinion letter, which is incorporated into the Contribution and Purchase Agreement, are "'clear and explicit'" and therefore govern its interpretation. (*Founding Members, supra*, 109 Cal.App.4th at p. 956.)

C. *Stock Subscription Agreement and Stockholder Agreement*

     1. The Stock Subscription Agreement and Stockholder Agreement Are Not Completely Integrated.

The Stock Subscription Agreement set forth the terms by which Brandy Signs obtained the 250,000 shares of Traffic Control Series A Preferred Stock and 51,724 shares of Traffic Control common stock. The Stockholder Agreement provides: (1) Traffic Control would issue several classes of stock, (2) Brandy Signs would receive

28

Traffic Control Series A Preferred Stock and common stock, and (3) Marwit Capital and the institutional investors would receive Traffic Control Series B Preferred Stock and common stock.

Under Delaware law, as reflected in the Restatement Second of Contracts, we determine whether the Stock Subscription Agreement and the Stockholder Agreement are partial integrations (final expressions) or complete integrations (complete and exclusive statements). (See *McKinney Family L.P. v. Stubbs, supra*, 2007 Del. Lexis 291 at p. *6.) The Stock Subscription Agreement and the Stockholder Agreement were "carefully and formally drafted," were signed by the parties, and included integration clauses. (*Carrow*, *supra*, 2006 Del.Ch. Lexis 191 at p. *16.) In addition, the parties negotiated extensively over the terms of those agreements. These facts are sufficient to create a presumption the Stock Subscription Agreement and the Stockholder Agreement are integrations.

The integration clauses are not conclusive on the matter of integration.[8] Instead, the presumption of integration was rebuttable with relevant evidence that the parties did not adopt the Stock Subscription Agreement and the Stockholder Agreement as completely integrated agreements. The evidence at trial rebutted the presumption of a complete integration. The fact there were three agreements intended to be part of the same transaction is evidence the parties did not intend for any one agreement to be a complete integration. As we have explained, evidence of the circumstances leading to the three agreements supported a finding that none of the agreements was a complete

---

[8] The Stock Subscription Agreement's integration clause states: "This Agreement constitutes the entire agreement between the parties pertaining to its subject matter and supersedes all prior written or oral agreements and understandings of the parties relating to the subject matter of this Agreement." The Stockholder Agreement's integration clause states: "This Agreement (including the Exhibits hereto, if any) and the Letter Agreement dated June 29, 2007 . . . constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and thereof."

29

integration. Evidence of the Oral Stock Redemption Agreement itself and the negotiations leading to it was admissible to establish that neither the Stock Subscription Agreement nor Stockholder Agreement was intended to be a complete integration. Because the Oral Stock Redemption Agreement "in the circumstances might naturally be omitted from the writing" (Rest.2d Contracts, § 216(2)), neither the Stock Subscription Agreement nor Stockholder Agreement was a complete integration.

Consequently, prior or contemporaneous agreements were not discharged to the extent they were consistent with the Stock Subscription Agreement and Stockholder Agreement, evidence of consistent prior or contemporaneous oral agreements was admissible, and evidence of consistent additional terms was admissible to supplement those agreements. (*McKinney Family L.P. v. Stubbs*, *supra*, 2007 Del. Lexis 291 at p. *6; *Galantino v. Baffone, supra,* 46 A.3d at p. 1081; *Husband (P.J.O.) v. Wife (L.O.)*, *supra*, 418 A.2d at p. 996; Rest.2d Contracts, §§ 213(1), 215, 216(1).) The issue thus becomes whether the Oral Stock Redemption Agreement is consistent with the Stock Subscription Agreement and the Stockholder Agreement.

2. The Oral Stock Redemption Agreement Is Consistent With the Stock Subscription Agreement.

Marwit argues the Oral Stock Redemption Agreement, which guarantees that Marwit will purchase Traffic Control Series A Preferred Stock from Kanno at a certain time and at a set price, is inconsistent with section B.2 of the Stock Subscription Agreement. That section states: "Investor's capital to be invested for an indefinite period of time, possibly without return. It has never been guaranteed or warranted by the Company's management, or any person connected with or acting on the Company's behalf, that Investor will be able to sell or liquidate the Shares in any specified period of time or that there will be any profit to be realized as a result of this investment."

The term "Investor" refers to Brandy Signs. Kanno, not Brandy Signs, is a party to the Oral Stock Redemption Agreement. Although neither Kanno nor Marwit

30

Capital (the parties to the Oral Stock Redemption Agreement) is a party to the Stock Subscription Agreement, its section C.7 states: "This Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, personal representatives, successors and assigns. . . . Anyone who purchases or otherwise acquires any of the Shares shall acquire such Shares subject to the provisions of this Agreement, and shall make no transfers in violation of this Agreement."

In its opening brief, Marwit argues that Kanno is a "representative" of Brandy Signs and Marwit Capital is a "representative" of Traffic Control within the meaning of section C.7 of the Stock Subscription Agreement. Section C.7 uses the term "*personal* representative" (italics added) which under Delaware law means "'[a] person who manages the legal affairs of another because of incapacity or death, such as the executor of an estate.'" (*Doroshow, Pasquale, Krawitz & Bhaya v. Nanticoke Mem. Hosp., Inc.* (Del. 2012) 36 A.3d 336, 344; accord Prob. Code, § 58, subd. (a).) Neither Kanno nor Brandy Signs is a personal representative. Kanno could not be the heir of Brandy Signs, and there is no evidence that Kanno is Brandy Signs' successor or assign.

In its reply brief, Marwit argues that if Kanno acquired the shares of Traffic Control preferred stock (which he would have to do to sell them to Marwit Capital), then, under section C.7 of the Stock Subscription Agreement, he would acquire the shares "subject to the provisions of this Agreement," which would include the disclaimer of section B.2. Marwit claims to have made this argument at page 47 of the appellant's opening brief, but that is incorrect. In the opening brief, the only argument based on section C.7 was that Kanno was a "representative" of Brandy Signs under the first sentence of section C.7. Marwit therefore forfeited the argument based on the last sentence of section C.7. (*Chicago Title Ins. Co. v. AMZ Ins. Services, Inc.* (2010) 188 Cal.App.4th 401, 427-428.)

Forfeiture notwithstanding, section B.2 of the Stock Subscription Agreement would not bind Kanno even if he acquired the shares of Traffic Control Series

31

A Preferred Stock. The term "Investor" in section B.2. is defined only as Brandy Signs. Section C.7 of the Stock Subscription Agreement does not state that if shares are purchased, the purchaser is deemed to be an Investor. The term "subject to the provisions of this Agreement" in section C.7 modifies the term "such Shares" because, under the last antecedent rule of contractual interpretation, a modifying phrase or clause applies to the immediately preceding word or phrase. (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2003) 107 Cal.App.4th 516, 529.) Therefore, while the shares of Traffic Control's Class A Preferred Stock are "subject to" the Stock Subscription Agreement, section B.2 should be interpreted as a representation or disclaimer binding only on the "Investor," which is Brandy Signs. In contrast, section B.4 states the Investor, *and any transferee of the shares*, agree to be bound by the restrictions on transfer contained in paragraph B.4. In other words, the drafters knew how to bind the transferee of the shares when they wanted to do so.

Accordingly, Marwit's agreement in the Oral Stock Redemption Agreement to purchase the shares of Traffic Control Series A Preferred Stock from Kanno is consistent with the provision in the Stock Subscription Agreement by which Traffic Control disclaims any guarantee that Brandy Signs will be able to sell those shares within a specified period of time at a profit.

3. <u>The Oral Stock Redemption Agreement Is Consistent with the Stockholder Agreement</u>.

Marwit argues the Oral Stock Redemption Agreement is inconsistent with restrictions placed on the voluntary transfer of shares, including a right of first refusal, in the Stockholder Agreement. According to Marwit, the Oral Stock Redemption Agreement, if enforceable, would transform Marwit's right of first refusal into an obligation to purchase.

The Oral Stock Redemption Agreement is consistent with the notice requirements and right of first refusal. The Stockholder Agreement places restrictions on

32

voluntary transfers of shares other than "Permitted Transfers." Those restrictions, found in section 2.1(a) of the Stockholder Agreement, include notice requirements and a right of first refusal granted to Marwit Capital and Traffic Control.[9] The right of first refusal terminates "following the earliest to occur of (a) a Qualified IPO or (b) a Change in Control." Permitted transfers are not subject to the restrictions.

Permitted transfers under section 4.2 of the Stockholder Agreement are: (1) from Marwit and the Co-Investors to their affiliates or pledges of shares to their respective lenders; (2) from Brandy Signs to Kanno; (3) from any Co-Investor to any other Co-Investor that acquires any right, title, or interest in that Co-Investor in any portion of the Junior Lien Agreement and the Junior Notes; (4) from any Management Holder or "the Seller" to (A) an immediate family member, (B) a trust established for the benefit of the Management Holder or Seller or family member, or (C) a corporation, partnership, limited liability company or "other Person controlled by any of the foregoing or such Management Holder or the Seller."[10]

---

[9] The full text of section 2.1(a) is: "Prior to any transfer of Shares or Options by any Management Holder or Co-Investor to any Proposed Transferee, the transferring Stockholder shall first send a notice to the Company and Marwit (a 'Transfer Notice') specifying the transferring Stockholder's intention to transfer all or a portion of the Shares or Options then held by the transferring Stockholder. The Transfer Notice shall constitute an offer to sell the offered Shares or Options (the 'Offered Shares') to Marwit or the Company on the same terms as contemplated in the Transfer Notice or, if such terms provide for consideration other than cash or a promissory note, for cash in an amount equal to the fair market value of such non-cash consideration. The Transfer Notice shall include a representation to Marwit and the Company that the transferring Stockholder has a good faith intention to sell the Offered Shares on the terms specified in the Transfer Notice." Under section 2.2, for a period of 20 days after the date of the Transfer Notice, Marwit and Traffic Control would have the right to purchase the shares at the offering price and on the terms specified in the Transfer Notice.

[10] The full text of section 4.2 is: "The following transfers of Shares shall be Permitted Transfers: (i) Marwit and the Co-Investors may transfer Shares to their Affiliates or pledge their shares in favor of their respective lenders; (ii) Brandy Signs, Incorporated may transfer Shares to Albert Kanno; (iii) any Co-Investor may transfer its shares to any other Co-Investor that acquires any right, title and interest of such Co-Investor in and to

33

Thus, transfer of shares from Brandy Signs to Kanno, which would be necessary for Kanno to transfer the shares to Marwit Capital under the Oral Stock Redemption Agreement, would be a permitted transfer under section 4.2(i) of the Stockholder Agreement. The parties dispute whether a transfer from Kanno to Marwit Capital or Marwit LLC would be a permitted transfer under section 4.2(iv)(C). (Nobody contends such a transfer would fall within section 4.2(ii), (iii), (iv)(A), or (iv)(B)).

We do not reach the issue whether a transfer from Kanno to Marwit Capital or Marwit LLC would be a permitted transfer under section 4.2(iv)(C) because the notice and right of first refusal requirements would not apply to such a transfer. Article II of the Stockholder Agreement, called "Restriction of Voluntary Transfer of Shares by Stockholders'" states that "[a]ny voluntary transfer of Shares or Options, other than a Permitted Transfer" is subject to notice requirements and right of first refusal. Section 2.1(a), called "Notice Requirements," states that "[p]rior to any transfer of Shares or Options *by any Management Holder or Co-Investor to any Proposed Transferee*, the transferring Stockholder shall first send a notice to the Company and Marwit (a 'Transfer Notice') specifying the transferring Stockholder's intention to transfer all or a portion of the Shares or Options then held by the transferring Stockholder." (Italics added.)

There are three Management Holders (Brandy Signs, Scott Metko, and Len Suazo). There are eight Co-Investors, none of which is Brandy Signs or Kanno.

---

all or any portion of the Junior Loan Agreement and the Junior Notes; and (iv) any Management Holder or the Seller, as applicable, may transfer Shares to (A) to a member of his or her immediate family, (B) to a trust established for the benefit of such Management Holder or the Seller; or his or her immediate family, or (C) to a corporation, partnership, limited liability company or other Person controlled by any of the foregoing or such Management Holder or the Seller (each a 'Permitted Transferee') without complying with this Agreement, provided such Management Holder obtains confirmation from the Company that such transfer does not obligate the Company to register such Shares under the 1933 Act and provided that, as to any Management Holder, such transfer does not result in the distribution of the Shares held by each applicable original Management Holder to more than 15 Persons."

Therefore, Kanno acting alone is neither a Management Holder (defined to include Brandy Signs but not Kanno) nor the Seller (defined to be Brandy Signs and Kanno *collectively*). Brandy Signs does not include Kanno. The drafters of the three agreements used the terms Brandy Signs, Kanno, and the Seller for different purposes and knew when and how to refer to Kanno individually or collectively with Brandy Signs. Because Kanno is not a Management Holder or Co-Investor, a transfer of shares by Kanno is not subject to the notice and first refusal requirements of the Stockholder Agreement.

The Oral Stockholder Agreement works quite neatly with the Stockholder Agreement. A transfer of shares from Brandy Signs to Kanno is a Permitted Transfer. A transfer of shares from Kanno to Marwit pursuant to the Oral Stock Redemption Agreement did not trigger the notice and right of first refusal provision because Kanno is not a Management Holder or Transferee. When exercising the Oral Stock Redemption Agreement, there would be no need for the notice and right of first refusal provision because Marwit Capital and Marwit LLC, in that situation, would be obligated to purchase the shares of Traffic Control Series A Preferred Stock.

If there is a conflict between the first sentence of Article II ("[a]ny voluntary transfer of Shares or Options, other than a Permitted Transfer") and section 2.1 (a) ("any transfer of Shares or Options by any Management Holder or Co-Investor to any Proposed Transferee"), the latter controls.[11] Under both Delaware law and California law, a specific provision of a contract controls over a general provision to the extent there

---

[11] Further, we note, the Oral Stock Redemption Agreement does not in concept contradict the right of first refusal. Any unpermitted proposed transfer by any of the three Management Holders or the eight Co-Investors would be subject to the notice and right of first refusal provision for as long as the Stockholder Agreement remains in effect. If the notice and right of first refusal provision of section 2.1 applied to proposed transfers by Kanno, then the effect of the Stock Redemption Agreement would be to supplement that agreement as a consistent additional term because in that situation Marwit Capital and Marwit LLC had to purchase the shares of Traffic Control Series A Preferred Stock on Kanno's request.

35

is an inconsistency. (*General Ins. Co. v. Truck Ins. Exch.* (1966) 242 Cal.App.2d 419, 426; *DCV Holdings, Inc. v. ConAgra, Inc.* (Del. 2005) 889 A.2d 954, 961.)

On the issue of consistency, Marwit argues that *ev3, Inc. v. Lesh, supra*, 114 A.3d 527 at page 528 is instructive. In *ev3*, the parties entered into a letter of intent stating the purchaser of a medical device company "'will commit'" to provide funding to ensure sufficient capital to achieve regulatory "'milestones'" toward the approval and marketability of a medical device. The parties later entered into a merger agreement which provided that the purchaser would fund and pursue regulatory milestones in the purchaser's "'sole discretion, to be exercised in good faith.'" (*Ibid.*) The merger agreement had an integration clause that stated the merger agreement did not supersede the letter of intent. (*Ibid.*) The Delaware Supreme Court concluded the funding provision in the letter of intent was not a binding provision and "[t]he reference in the letter of intent in the integration clause did not convert the non-binding Funding Provision into a binding contractual obligation." (*Id.* at p. 536, fn. omitted.) The Delaware Supreme Court also concluded the funding provision of the letter of intent was inconsistent with the merger agreement because "[a] provision that allows a buyer to make funding decisions in its 'sole discretion' is plainly inconsistent with the Funding Provision, which required [the purchaser] to fund on a specific schedule." (*Id.* at p. 537.)

The Oral Stock Redemption Agreement and the Stockholder Agreement do not present such a conflict between an entirely discretionary act and an entirely obligatory one. The Stockholder Agreement grants Traffic Control and Marwit Capital the right of first refusal of any qualified offer from any Management Holder or Co-Investor to *any* proposed transfer, and that right continues until the time of an initial public offering or a change in control. The right includes that right not to purchase the shares. After three years, both Traffic Control and Marwit Capital still will have the right of first refusal. For example, if after three years, Brandy Signs decided to sell the shares of Traffic Control Series A Preferred Stock to a third party (say, for a price greater than

36

that set forth in the Oral Stock Redemption Agreement), then Traffic Control and Marwit Capital could exercise the right of first refusal and purchase the shares. The Oral Stock Redemption Agreement supplements the Stockholder Agreement with an additional term that after three years, Kanno can demand that Marwit Capital or Marwit LLC purchase the shares at the agreed-upon price.

Our conclusion that the Oral Stock Redemption Agreement was enforceable and not barred by the parol evidence rule is consonant with Delaware law and policy. Delaware's stated policy underlying the parol evidence rule is "to avoid upsetting the sanctity of fully integrated written agreements." (*Galantino v. Baffone, supra,* 46 A.3d at p. 1081.) "Delaware courts seek to ensure freedom of contract and promote clarity in the law in order to facilitate commerce." (*ev3, Inc. v. Lesh, supra*, 114 A.3d at p. 529, fn. 3.) Neither the Stock Subscription Agreement nor the Stockholder Agreement is a completely integrated agreement under Delaware law. The jury, after considering the evidence and assessing witness credibility, found the parties had made the Oral Stock Redemption Agreement, and the trial court, having considered the same evidence, found that agreement was part of their transaction. By giving effect to the Oral Stock Redemption Agreement, the terms of which are consistent with those two agreements, we are respecting and upholding the parties' freedom of contract and enforcing the terms of their agreement as found by the trier of fact.

### III.

### Kanno Had Standing to Sue for Breach of Contract.

Marwit argues Kanno lacked standing to enforce the Oral Stock Redemption Agreement because Brandy Signs is the owner of the shares of Traffic Control Series A Preferred Stock. Kanno is a party to the Oral Stock Redemption Agreement and therefore had standing to sue for its breach. "[I]t goes without saying that a party to a contract or one for whom the contract was intended to benefit may bring

37

actions related to such contracts." (*Market Lofts Community Assn. v. 9th Street Market Lofts, LLC* (2014) 222 Cal.App.4th 924, 932.)

Whether Kanno could do everything that was required of him under the Oral Stock Redemption Agreement, or was excused from doing so, is a different matter. In that regard, the statement of decision includes this finding: "The jury found—and the Court, independently considering the evidence, also finds—that Kanno and the Marwit Parties entered into the Oral [Stock Redemption] Agreement, that Kanno did everything required of him under that agreement that was not excused, that the Marwit Parties breached the agreement, and that Kanno suffered damage. Defendants' theory appears to be that because Kanno did not himself own the TCSC Stock—Joji's, Inc. (f/k/a Brandy Signs, Inc.) owned it—Joji's was the real party in interest, and only Joji's and not Kanno had standing. This misconceives the nature of standing. Kanno, not Joji's, was a party to the contract. If for some reason Kanno proved unable to deliver the stock when payment was due, he would have been unable to perform and therefore, absent an excuse, could not have enforced the contract. But that has nothing to do with whether he had standing to assert the breach of a contract to which only he, and not Joji's was a party."

Marwit does not argue Kanno lacked or lacks the ability to obtain from Brandy Signs the shares of Traffic Control Series A Preferred Stock. Instead, Marwit argues that if Kanno obtains the shares, he holds them subject to the terms of the Stock Subscription Agreement which is "binding on Brandy Signs's successors, assigns, and *anyone else* who acquires the stock." As we have explained, Kanno is not a personal representative of Brandy Signs, and the representation regarding stock price does not bind a transferee of shares who is not also a successor, assign, or personal representative of the original holder.

38

## DISPOSITION

The judgment is affirmed.  Respondent shall recover costs on appeal.


FYBEL, J.

WE CONCUR:


O'LEARY, P. J.


BEDSWORTH, J.